Hillsborough,
No. 5167.

STATE *v.* RUSSELL NELSON.

STATE *v.* FRED J. MARTINEAU.

Argued October 3, 1963.
Decided December 20, 1963.

*William Maynard*, Attorney General, *Elmer T. Bourque*, Deputy Attorney General and *Conrad Danais*, county attorney (*Mr. Bourque* orally), for the State.

*Julius H. Soble* (of Massachusetts) (by brief and orally), for defendant Martineau.

*Leo Patrick McGowan* (of Rhode Island) (by brief and orally), for defendant Nelson.

*Leonard & Leonard* (*Mr. Richard Leonard* orally), for both defendants.

WHEELER, J. The defendants stipulated as to the following facts:

"This stipulation is filed in conjunction with the defendants' motion for a new trial based on the claim that under *Mapp v. Ohio*, 367 U. S. 643, decided June 19, 1961, certain evidence used against the defendants was illegally obtained and inadmissible.

"1. The circumstances leading to the apprehension of Russell Nelson are as follows: Police officers in Nashua, at 12:51 A. M., Monday, February 9, 1959 observed a 1959 light colored Chevrolet automobile with one occupant, Robert Almonte, proceeding north on Main Street. As the car passed through the intersection of Hollis Street it slowed down and veered to the right. The operator looked toward the Yankee Flyer Restaurant and then pulled into the center lane and continued in a northerly direction. The police officers in question walked north on the westerly side of Main Street to the Central Variety Store from which point they observed a man, Russell Nelson, on the opposite side of the street walking south and saw him turn into

a driveway next to the Yankee Flyer. At about the same time Almonte reappeared in the 1959 Chevrolet proceeding south on Main Street. The automobile turned into the same driveway and shortly thereafter returned to Main Street with Almonte still driving and Nelson in the front passenger seat. The officers stepped into the street and stopped the vehicle. Almonte could not produce a driver's license and both he and Nelson were taken to the Police Station and booked for questioning.

"Shortly after being taken to the police station Nelson and Almonte were questioned by Sgt. Tafe. Records at the police department disclose that the registration plates on the Chevrolet correspond with those of a vehicle listed as being stolen on October 3, 1958. Sgt. Tafe telephoned to Providence and was advised of the criminal records of Nelson and Almonte. There was an exchange of teletype messages; at 4:44 A. M. the Providence Police teletyped that the stolen car listing was cancelled on October 5, 1958. Sgt. Tafe and Officer Lavoie searched the entire area for evidence of a stolen car, burglary or other crime. It was in the course of this search that Martineau was apprehended.

"2. The circumstances leading to the apprehension of Fred Martineau were as follows: Later that same morning at 3:50 A. M. Martineau was seen at the parking lot located at the intersection of Spring and East Pearl Streets. Officer Lavoie in a patrol car proceeding north on Spring Street approaching the parking lot observed him walking toward Spring Street. As Martineau approached the officer opened the door of his vehicle and snapped on the dome light. Martineau who was about six feet from the police car, looked at the officer and then proceeded to run south on Spring Street toward the Junior High School. The officer gave chase and Martineau disappeared around the southeast corner of the school building where he was apprehended some fifteen hundred feet from the point where Gagnon's body was later found. He was taken to the police station by the officer and was booked for questioning.

"Martineau was also questioned by Sgt. Tafe and there was an exchange of teletype messages between Nashua and Pawtucket concerning Martineau. Copies of the teletype messages are appended.

"3. Nelson and Martineau were originally booked for questioning. These entries were subsequently changed from 'Questioning' to 'S. P. of Felony'. The records do not indicate the

time when these changes were made. Copies of the arrest records are appended. The State reserves the right to introduce evidence concerning the time when the changes were made.

"4. At 11:55 A. M. on February 9, 1959, the Nashua police received a call that a body was found in a parked car off Church Street in Nashua. Upon investigation, one Maurice Gagnon was found in his automobile, the apparent victim of murder.

"5. At 2:00 P. M. on February 9, 1959, some thirteen (13) hours after his apprehension, Russell Nelson was questioned by the Inspector's Division. On request Nelson removed and handed to the police the following items of clothing: Leather jacket, trousers, belt, shirt, stockings and shoes. At 4:00 P. M. on February 9, 1959, some twelve (12) hours after his original detention, Fred Martineau was questioned by members of the Nashua and Rhode Island Police Departments. On request Martineau removed and handed to the police the following items of clothing: his trousers, topcoat and suede jacket. On the following day the remainder of his clothing was obtained in the same manner; sportshirt, shoes, stockings and T-shirt. Specimens of dirt were also removed from Martineau's finger-nails and a benzidine test, for the detection of blood, was performed on his hands at or about that time.

"6. On the evening of February 9, 1959 Justice Antoine Guertin of the Nashua Municipal Court granted petitions for additional detention of the prisoners. Copies of the petitions are appended.

"7. Both respondents were detained at the Nashua police station, without being formally charged with a crime, until 9:00 P. M. on February 11, 1959, when complaints were drawn charging them with first degree murder. Sometime around noon-time on February 11, 1959, more than fifty-six (56) hours after their original detention, they were allowed to contact legal counsel. Counsel were permitted to see the respondents in the late afternoon of February 11, 1959.

"8. When questioned by the police on the afternoon of February 9, 1959, and at subsequent times of questioning, both respondents demanded to see their lawyers; their requests were denied by Nashua police.

"9. At 9:00 A. M. on February 12, 1959, both respondents were arraigned before the Nashua Municipal Court and charged with first degree murder; both pleaded not guilty.

"10. At about 9:00 A. M. on February 13 hair specimens were procured from both Martineau and Nelson. In each case police handed the individual a clean comb and allowed him to comb his hair. Specimens adhering to the comb were preserved. According to the State's expert hair samples found in the victim's car could have come from the victim and could have come from the respondent Martineau. There were not sufficient specimens of Nelson's hair to justify an opinion by the State's expert.

"11. All items of clothing, hair and other specimens of the respondents which had been taken from them as set forth in paragraphs 5 & 6 hereof were subject to extensive scientific tests by Professor Harold C. Harrison, of the Rhode Island State Police Crime Laboratory and Lt. Carrol Durfee of the New Hampshire State Police.

"12. Items of clothing taken from the respondents were received in evidence against the respondents as follows:

"A. *Nelson's Clothing.* All of Nelson's clothing was taken at 2:00 P. M., Monday, February 9:

"(1) Nelson's Jacket. Blood was found on this item. It could not be determined whether the blood was human.

"(2) Nelson's Trousers. Small plastic particles found on Nelson's trousers corresponded to similar particles found in the victim's automobile and to plastic materials used in the victim's factory, Magco Plastics. It was the opinion of the State's expert witness that the contamination on Nelson's trousers probably originated from the interior of the victim's automobile.

"(3) Nelson's Shoes. An area of blood was found in the stitching of Nelson's right shoe. Fiber particles removed from Nelson's shoes were compared with fibers of the floormats of the victim's automobile. Based upon this comparison the State's expert testified that Nelson's shoes had been in contact with one or more of the floor mats of the victim's automobile.

"B. *Martineau's Clothing.* Admitted in evidence were the following items of clothing which except for four (4) were taken from Martineau at 4:00 P. M., Monday, February 9:

"(1) Martineau's topcoat. An area of blood was found just behind the left pocket—it could not be determined whether this blood was animal or human; a blood stain of considerable size was found in the lining of the same pocket—this was human blood type O, the same type as the victim's and the respondent Martineau's. On the inside of the left topcoat pocket

was a smudge identified as firearms discharge residue. In the opinion of the State's expert this indicated that the pocket had been in contact with an object bearing firearms discharge residue and that the object could have been a semi-automatic weapon which the state claimed was the murder weapon.

"(2) Martineau's Suede Jacket. An area of blood was found on the left side of the jacket and several stains were found in the left pocket.

"(3) Martineau's Trousers. Human blood of undetermined type was found in the lining of the left side pocket; blood stains were also found in the right hip pocket and in the fly. Small plastic particles found on Martineau's trousers corresponded to similar particles found in the victim's automobile and to plastic materials used in the victim's factory. It was the opinion of the State's expert witness that the contamination on Martineau's trousers originated from the interior of the victim's automobile.

"(4) Martineau's Shoes. Martineau's shoes were taken Tuesday, February 10. Two blood stains were found on the left shoe, and one on the right shoe. Fiber particles removed from Martineau's shoes were compared with fibers of the floor mats of the victim's automobile. Based on this comparison the State's expert testified that Martineau's shoes had been in contact with one or more of the floor mats of the victim's automobile.

"13. Neither of the respondents objected or took exception to the introduction of the evidence described above."

Three principal contentions as a basis for a new trial are now advanced by the defendants as a result of the decision in *Mapp* v. *Ohio*, 367 U. S. 643, decided since the original transfer of these cases to this court. (1) Was certain physical evidence including clothing, shoes, blood stains, hair clippings, fingernail scrapings removed from the defendants' person obtained as a result of an unlawful search and seizure, during a period when the defendants were deprived of counsel, in violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States? (2) Does the rule of *Mapp* v. *Ohio*, *supra*, have a retroactive effect and (3) Are the defendants barred from now raising these issues because of their failure to object to admission of the evidence during the trial in Superior Court?

The question of procedure raised by the third question will be first considered.

The State correctly argues that this court will not ordinarily

consider the admissibility of evidence admitted in the Trial Court without objection (*Canney* v. *Emerson*, 82 N. H. 487, 488) and that state procedural requirements must be observed in raising and preserving Federal constitutional questions if they are to be considered by the United States Supreme Court.

At the time of the trial of these cases *Mapp, supra,* had not been decided. Under the law of this state and of the United States as applied to state courts existing at the time of the trial, it would have been futile to object to the admission of such physical evidence even if it had in fact been unlawfully seized. *Weeks* v. *United States*, 232 U. S. 383; *Wolf* v. *Colorado*, 338 U. S. 25; *State* v. *Mara*, 96 N. H. 463. Considering the circumstances which existed, the failure of defendants' counsel to object to the introduction of this physical evidence is understandable. In view of the seriousness of the charges against these defendants we have considered the objections to the introduction of this evidence as if seasonably taken. *State* v. *Long*, 90 N. H. 103, 107.

The second question transferred is does the rule of *Mapp* v. *Ohio*, 367 U. S. 643 have a retroactive effect. We think it would be presumptuous on the part of this court to attempt to decide what the United States Supreme Court did not. The court apparently found no compelling reason in *Mapp* to expressly declare that the decision should be prospective only. But see *Gaitan* v. *United States*, 317 F. 2d 494 (10th Cir. 1963); *United States* v. *Walker*, 323 F. 2d 11, 12 (5th Cir. 1963). However, we are not called upon to speculate upon this issue, since the facts and circumstances of this case are clearly distinguishable from those of the *Mapp* case, and we are of the opinion the rule of that case has no application.

The remaining question presented by the defendants' argument with respect to the physical evidence obtained from the defendants is whether the "evidence was obtained as a result of an unlawful search and seizure during a period when the defendants were deprived of counsel in violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States."

At the time that the police obtained most of the articles of clothing from the defendants, they had been in custody for a period of some twelve or thirteen hours. The defendants contend that this was an unlawful search and seizure, either because the defendants were not then under arrest as defined by RSA 594:1

and RSA 594:2(c), or because if then under arrest, the arrest was illegal because no reasonable ground for arrest was then known to the authorities. RSA 594:10(b) (2).

As this court pointed out in *State* v. *Mihoy*, 98 N. H. 38, 42 "failure to comply with [RSA 594:23] without more, is not cause to reverse [a] conviction." See also, *State* v. *Lavallee*, 104 N. H. 443, and cases cited.

The evidence in question was not obtained by unreasonable search and seizure. There was no search because the articles turned over to the police by the defendants were readily visible and accessible to the police. There was no seizure where the articles were voluntarily relinquished by the defendants. See *United States* v. *Sferas*, 210 F. 2d 69 (7th Cir. 1954); *State* v. *Hanna*, 150 Conn. 457 (1963). No claim is advanced that force or coercion was utilized by the authorities to obtain possession of it. Hence the record furnishes no basis for the argument that the evidence was obtained by unreasonable search or seizure. Nor can it successfully be maintained that it was the product of illegal detention, or that the will of the defendants was overborne when the clothing was relinquished. The maintenance of a proper balance between the rights of the individual and those of society in the investigation of crime does not require the suppression of this evidence. *Ker* v. *California*, 374 U.S. 23.

We are dealing here with physical evidence voluntarily removed and handed to the police by the defendants on request rather than with an oral confession obtained after many hours of interrogation. No question has been raised here that this physical evidence was not relevant and that the alleged illegal detention in any way affected its trustworthiness.

The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against a defendant. Proper fulfillment of this function requires that all relevant competent evidence be admissible unless the manner in which it has been obtained compels its exclusion to protect a constitutional right of the defendant. See *Lopez* v. *United States*, 373 U. S. 427.

Based upon the agreed facts before us there is no reason to conclude that the evidence obtained from the defendants was secured either by unreasonable search and seizure or by reason of illegal detention, or that its use at the trial was proscribed by the rule of *Mapp* v. *Ohio*, or other decisions relied upon by

the defendants. See *Commonwealth* v. *Senk*, 412 Pa. 288 (1963).

If it is to be the law that police officials cannot obtain articles of personal property voluntarily from defendants during detention and before arrival of counsel, it seems to us it would strike a mortal blow at modern scientific police investigation and have a devastating effect on law enforcement. Under the circumstances of this case another tribunal must take the responsibility of establishing it.

The fact that this evidence was obtained at a time before the defendants conferred with counsel did not render it incompetent at the trial. The defendants were permitted to communicate with counsel at noon of the second day after their apprehension, and to confer with them a few hours later. They were called upon to make no answer to any formal charge until they were arraigned with counsel present in the municipal court of Nashua on the following day. *Cf. Hamilton* v. *Alabama*, 368 U. S. 52; *White* v. *Maryland*, 373 U. S. 59.

Under the rule laid down in *Crooker* v. *California*, 357 U. S. 433 and *Cicenia* v. *LaGay*, 357 U. S. 504, failure to furnish an accused with counsel does not violate due process unless he is "so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.'" *Crooker* v. *California, supra*, 439. A conclusion that these defendants were deprived of "fundamental fairness" because not permitted to confer with counsel during police interrogation is not compelled. We affirm the finding of the Trial Court that they were not so deprived under all the facts and circumstances of this case. Cases dealing with the right to counsel which have been decided since *Crooker* and *Cicenia*, compel no different conclusion. *Gideon* v. *Wainwright*, 372 U. S. 335; *Douglas* v. *California*, 372 U. S. 353; *White* v. *Maryland*, 373 U. S. 59; *Hamilton* v. *Alabama*, 368 U. S. 52; *Spano* v. *New York*, 360 U. S. 315.

On the date of the hearing (March 15, 1963) on the first motion for a new trial the defendants moved further for a new trial on the grounds of newly discovered evidence.

In support of the motion three affidavits were filed each given by an inmate of some penal institution who had himself been convicted of at least one felony. All of the affidavits relate to the testimony of one Crooker who was a witness for the State at the trial of the defendants in the Superior Court. Crooker

and defendant Nelson were both inmates at the Hillsborough County jail at the time of the trial. Crooker testified at the trial that Nelson told him in effect that he had aided and abetted Martineau in shooting the victim. *State* v. *Nelson*, 103 N. H. 478, 487. His evidence was restricted to Nelson's case.

The affidavits in substance state that Crooker told the deponents he perjured himself at the time of the trial in return for a recommendation of clemency in connection with certain felony charges pending against him. It appeared that all cases pending against Crooker had been disposed of and he was confined in jail under sentence at the time he testified. At the time of the trial he was extensively cross-examined by defendants' counsel as to whether he had made a "deal" with State's counsel.

To warrant a new trial on newly discovered evidence it must be established to the satisfaction of the Trial Court that such evidence goes to the merits of the case and not merely has a tendency to impeach or discredit a witness and must be of such a character that it is at least probable that a different result will be reached upon another trial. *State* v. *Danforth*, 73 N. H. 215, 221.

The Trial Court could properly find that the newly discovered evidence was strictly impeaching and as such was not ground for a new trial. *State* v. *Long*, 90 N. H. 103, 107. The Trial Court found that considering all the evidence of the trial the newly discovered evidence would not probably produce a different result. *McGinley* v. *Railroad*, 79 N. H. 320, 321; *State* v. *Long, supra*; *State* v. *Sturtevant*, 96 N. H. 99, 106, 107.

We think the Trial Court's order in denying defendants' motion for a new trial on newly discovered evidence was in accordance with our established law.

The order therefore is

*Defendants' exceptions overruled.*

Kenison, C.J., dissented; the others concurred.

Kenison, C.J., *dissenting*: How far is too far and how long is too long in any given situation has been a thorny problem in the judicial process which has vexed bench and bar for a long time. Nevertheless both the extent of and the time for detention and interrogation of persons suspected of crime are

being limited and shortened under recent decisions of the Supreme Court of the United States. Where and when to draw the line may not be delineated until another case on another Monday. But, as of today and henceforth, it is my understanding that the detention and intermittent interrogation incommunicado of the defendants for a period of "more than fifty-six (56) hours," coupled with the refusal to allow them "to contact legal counsel" for approximately forty-two hours, will not pass muster under a fair reading of existing decisions.

Reliance is placed on the closely divided decisions in 1957 of *Crooker* v. *California*, 357 U. S. 433, and *Cicenia* v. *LaGay*, 357 U. S. 504. It is true that these decisions have not been overruled but they have been undermined. Note, Right to Counsel During Police Interrogation, 16 Rutgers L. Rev. 573 (1962). *Haynes* v. *Washington*, 373 U. S. 503. Although we are not dealing with a confession of guilt in the present case, we are confronted with convictions based in part on incriminating evidence obtained from the defendants in custody while they were undergoing interrogation incommunicado during denial of counsel. In *White* v. *Maryland*, 373 U. S. 59, 60, the absence of counsel at arraignment was fatal and the court added the significant statement ". . . we do not stop to determine whether prejudice resulted." It is difficult to see how the secret detention and denial of counsel during lengthy interrogation can be approved if the right to counsel demanded by *Gideon* v. *Wainwright*, 372 U. S. 355, and *White* v. *Maryland, supra*, is to be meaningful and effective. Professor Sutherland, a perceptive commentator on the constitutional scene, has pointed out the inconsistency of the *Crooker-Cicenia* doctrine with the rationale of *White* v. *Maryland*: "Time seems to be running against *Crooker* and *Cicenia*." Sutherland, Detention, Interrogation, and The Right to Counsel. Address, Conference of Chief Justices (August 15, 1963).

No case precisely parallel to the present one has been cited by counsel. Whether *Mapp* v. *Ohio*, 367 U. S. 643 is applicable to this proceeding may be debatable but I think that it is. The combination of detention, interrogation, and denial of counsel for the time and under the circumstances set forth in the stipulated facts resulted in evidence to convict just as much as would an illegal search and seizure. Whether some other court will consider this prejudicial (*Fahey* v. *Connecticut*, 372 U. S. 928), or below "the Plimsoll line of due process," a new trial should

be required. See *People* v. *Donovan*, 13 N. Y. 2d 148; Broeder, Wong Sun v. United States, A Study in Faith and Hope, 42 Neb. L. Rev. 483, 606 (1963); *Lee* v. *United States*, 322 F. 2d 770 (5th Cir. 1963).