Russell NELSON and Fred J. Martineau

v.

Parker L. HANCOCK, as he is the Warden of the State Prison, Concord, New Hampshire.

Civ. A. No. 2514.

United States District Court
D. New Hampshire.

March 1, 1965.

Leo Patrick McGowan and John P. Bourcier, Providence, R. I., for petitioner Nelson.

Julius Soble, Boston, Mass., and Richard W. Leonard, Nashua, N. H., for petitioner Martineau.

Alexander J. Kalinski, Asst. Atty. Gen., for State of New Hampshire, Concord, N. H., for defendant.

CONNOR, District Judge.

This is a petition for habeas corpus under 28 U.S.C. § 2241(c) (3). Petitioners are under sentence of capital punishment stemming from their conviction in the New Hampshire court on two indictments: the first charged petitioner Martineau with the deliberate and premeditated homicide of one Maurice Gagnon and charged petitioner Nelson with aiding and abetting the homicide; the second indictment charged both petitioners jointly with murder in the first degree while perpetrating the crime of kidnapping. Petitioners, by their counsel, have submitted briefs and have presented oral argument.

As a preliminary matter, the Court finds that petitioners have satisfied the requirements of 28 U.S.C. § 2254 with respect to their claims of unreasonable search and seizure and deprivation of the assistance of counsel. These claims were raised before the Supreme Court of New Hampshire and were rejected by that court in an opinion, State v. Nelson, which appears at 105 N.H. 184, 196 A.2d 52. However, petitioners' claim that the State knowingly used perjured testimony at their trial does not seem to have been so raised. It is true that petitioners challenged the testimony of one Crooker in their motion for a new trial, but nowhere in their briefs to the State Supreme Court (which are collected in Vol. 596 of New Hampshire Briefs & Cases) or in the opinion of the State Supreme Court does

it appear that the allegation of *knowing* use of perjured testimony by the State was advanced. And it is *knowing* use of such testimony which creates a Constitutional issue. Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The Court concludes, therefore, that this Constitutional claim has not been presented to the State Supreme Court. It does not appear that petitioners are without a remedy by which they could raise this claim in the State Court at this time. Since, in the Court's view, petitioners have not exhausted their State remedies as to their claim of knowing use by the prosecution of perjured testimony, the Court will not consider this claim further at this time. 28 U.S.C. § 2254; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Irvin v. Dowd, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

## FINDINGS OF FACT

The parties have agreed on the following, and the Court finds them to be fact:

As to petitioner Nelson:

1. The circumstances leading to the apprehension of Russell Nelson are as follows: Police officers in Nashua, at 12:51 A.M., Monday, February 9, 1959, observed a 1959 light colored Chevrolet automobile with one occupant, Robert Almonte, proceeding north on Main Street. As the car passed through the intersection of Hollis Street it slowed down and veered to the right. The operator looked toward the Yankee Flyer Restaurant and then pulled into the center lane and continued in a northerly direction. The police officers in question walked north on the westerly side of Main Street to the Central Variety Store from which point they observed a man, Russell Nelson, on the opposite side of the street walking south and saw him turn into a driveway next to the Yankee Flyer. At about the same time, Almonte reappeared in the 1959 Chevrolet proceeding south on Main Street. The automobile turned into the same drive-

way and shortly thereafter returned to Main Street with Almonte still driving and Nelson in the front passenger seat. The officers stepped into the street and stopped the vehicle. Almonte could not produce a driver's license and both he and Nelson were taken to the police station and booked for questioning.

Shortly after being taken to the police station, Nelson and Almonte were questioned by Sgt. Tafe. Records at the police department disclosed that the registration plates on the Chevrolet corresponded with those of a vehicle listed as being stolen on October 3, 1958. Sgt. Tafe telephoned to Providence and was advised of the criminal records of Nelson and Almonte. There was an exchange of teletype messages; at 4:44 A.M. the Providence police teletyped that the stolen car listing was cancelled on October 5, 1958. Sgt. Tafe and Officer Lavoie searched the entire area for evidence of a stolen car, burglary or other crime. It was in the course of this search that Martineau was apprehended.

As to petitioner Martineau:

2. The circumstances leading to the apprehension of Fred Martineau were as follows: Later that same morning at 3:50 A.M. Martineau was seen at the parking lot located at the intersection of Spring and East Pearl Streets. Officer Lavoie in a patrol car proceeding north on Spring Street approaching the parking lot observed him walking toward Spring Street. As Martineau approached the officer opened the door of his vehicle and snapped on the dome light. Martineau, who was about six feet from the police car, looked at the officer and then proceeded to run south on Spring Street toward the Junior High School. The officer gave chase and Martineau disappeared around the southeast corner of the school building where he was apprehended some fifteen hundred feet from the point where Gagnon's body was later found. He was taken to the police station by the officer and was booked for questioning.

Martineau was also questioned by Sgt. Tafe and there was an exchange of tele-

type messages between Nashua and Pawtucket concerning Martineau.

As to both Petitioners:

3. Nelson and Martineau were originally booked for questioning.[1] These entries were subsequently changed from "Questioning" to "S.P. of Felony." The records do not indicate the time when these changes were made.[2]

4. At 11:55 A.M. on February 9, 1959, the Nashua police received a call that a body was found in a parked car off Church Street in Nashua. Upon investigation, one Maurice Gagnon was found in his automobile, the apparent victim of murder.

5. At 2:00 P.M. on February 9, 1959, some thirteen hours after his apprehension, Russell Nelson was questioned by the Inspector's Division. On request, Nelson removed and handed to the police the following items of clothing: leather jacket, trousers, belt, shirt, stockings and shoes. At 4:00 P.M. on February 9, 1959, some twelve hours after his original detention, Fred Martineau was questioned by members of the Nashua and Rhode Island Police Departments. On request, Martineau removed and handed to the police the following items of clothing: his trousers, topcoat and suede jacket. On the following day, the remainder of his clothing was obtained in the same manner: sportshirt, shoes, stockings and T-shirt. Specimens of dirt were also removed from Martineau's fingernails and a benzidine test, for the detection of blood, was performed on his hands at or about that time.

1.
"59–1214 Complaint No.

ARREST RECORD
Police Department Nashua, N.H.
(Last Name) Nelson  (First Name) Russell  (Middle Name or Initial) J.
(Address) 426 BroadWay Street, Providence, R.I.
(Date of Birth) 9–26–28
(Cell Number 1–F)  (Date of Arrest) 2–9–59  (Hour of Arrest) 1:05 A.M.
(Place of Arrest) Main Street
(Charge) Booked for Murder at 9 PM. Feb. 11; 1959.
~~Questioning~~ S.P. of Felony
(Arrested by) Off. Quigley (Sight) X
        " Bazin
(Booked by) Sergt Cross
Held for the April Term of Grand Jury with out bail
(Judge) Guertin  (Date) 2/16/59"

"59–1216 Complaint No.

ARREST RECORD
Police Department Nashua, N.H.
(Last Name) Martineau  (First Name) Fred  (Middle Name or Initial) J.
(Address) 51 Magill Street, Pawtucket, R.I.
(Date of Birth) 5–27–25  (Sex) Male X
(Cell Number 17)  (Date of Arrest) 2–9–59  (Hour of Arrest) 3:55 A.M.
(Place of Arrest) Spring Street
(Charge) Booked for murder at 9 PM. Feb. 11; 1959
~~Questioning~~ S.P. of Felony
(Arrested by) Off. B. Lavoie (Sight) X
(Booked by) Sergt. Cross
(Release authorized by) Sheriff O'Brien (Date) 2–16–59 (Time) 4–25 P.M.
Held without bail for the April"

2. The changes were accomplished by typing over the word "Questioning" and adding the words "S.P. of Felony."
The allegation of fact agreed to by the State contained the following: "The arrest records are appended. The State reserves the right to introduce evidence concerning the time when the changes were made."

6. On the evening of February 9, 1959, Justice Antoine Guertin of the Nashua Municipal Court granted petitions for additional detention of the prisoners.[3]

7. Both respondents were detained at the Nashua Police Station, without being formally charged with a crime, until 9:00 P.M. on February 11, 1959, when complaints were drawn charging them with first degree murder. Sometime around noontime on February 11, 1959, more than fifty-six hours after their original detention, they were allowed to contact legal counsel. Counsel were permitted to see the respondents in the late afternoon of February 11, 1959.

8. When questioned by the police on the afternoon of February 9, 1959, and at subsequent times of questioning, both respondents demanded to see their lawyers; their requests were denied by Nashua police.

9. At 9:00 A.M. on February 12, 1959, both respondents were arraigned before the Nashua Municipal Court and charged with first degree murder; both pleaded not guilty.

10. At about 9:00 A.M. on February 13, hair specimens were procured from both Martineau and Nelson. In each case, police handed the individual a clean comb and allowed him to comb his hair. Specimens adhering to the comb were preserved. According to the State's expert, hair samples found in the victim's car could have come from the victim and could have come from the respondent Martineau. There were not sufficient specimens of Nelson's hair to justify an opinion by the State's expert.

11. All items of clothing, hair and other specimens of the respondents which had been taken from them as set forth in paragraphs 5 and 6 hereof were subjected to extensive scientific tests by Professor Harold C. Harrison of the Rhode Island State Police Crime Laboratory and Lt. Carroll Durfee of the New Hampshire State Police.

3. "Your petitioner respectfully requests that Nelson, Russell J., of Providence, R.I. now in my custody on suspicion of having committed a crime be detained in my custody for a further period as provided by N.H. Revised Statutes Annotated 1955, Chapter 594:23.

Dated: February 9, 1959

Joseph L. Regan
Joseph L. Regan
Chief of Police
Nashua, New Hampshire

Upon hearing the above petition, the same is granted that he be held for a further period not exceeding forty-eight hours.

Antoine Albert Guertin
Presiding Justice"

"Your Petitioner respectfully requests that Fred Martineau, of Pawtucket, R.I. now in my custody on suspicion of having committed a crime be detained in my custody for a further period as provided by N.H. Revised Statutes Annotated 1955, Chapter 594:23.

Dated: February 9, 1959

Joseph L. Regan
Joseph L. Regan
Chief of Police
Nashua, New Hampshire

Upon hearing the above petition, the same is granted that he be held for a further period not exceeding forty-eight hours.

Antoine Albert Guertin
Presiding Justice"

12. Items of clothing taken from the respondents were received in evidence against the respondents as follows:

A. *Nelson's clothing.* All of Nelson's clothing was taken at 2:00 P.M. Monday, February 9:

(1) Nelson's jacket. Blood was found on this item. It could not be determined whether the blood was human.

(2) Nelson's trousers. Small plastic particles found on Nelson's trousers corresponded to similar particles found in the victim's automobile and to plastic materials used in the victim's factory, Magco Plastics. It was the opinion of the State's expert witness that the contamination on Nelson's trousers probably originated from the interior of the victim's automobile.

(3) Nelson's shoes. An area of blood was found in the stitching of Nelson's right shoe. Fiber particles removed from Nelson's shoes were compared with fibers of the floor mats of the victim's automobile. Based upon this comparison, the State's expert testified that Nelson's shoes had been in contact with one or more of the floor mats of the victim's automobile.

B. *Martineau's clothing.* Admitted in evidence were the following items of clothing which except for item (4) were taken from Martineau at 4:00 P.M., Monday, February 9:

(1) Martineau's topcoat. An area of blood was found just behind the left pocket. It could not be determined whether this blood was animal or human; a blood stain of considerable size was found in the lining of the same pocket. This was human blood type O, the same type as the victim's and the respondent Martineau's. On the inside of the left topcoat pocket was a smudge iden-

tified as firearms discharge residue. In the opinion of the State's expert, this indicated that the pocket had been in contact with an object bearing firearms discharge residue and that the object could have been a semi-automatic weapon which the State claimed was the murder weapon.

(2) Martineau's suede jacket. An area of blood was found on the left side of the jacket and several stains were found in the left pocket.

(3) Martineau's trousers. Human blood of undetermined type was found in the lining of the left side pocket; blood stains were also found in the right hip pocket and in the fly. Small plastic particles found on Martineau's trousers corresponded to similar particles found in the victim's automobile and to plastic materials used in the victim's factory. It was the opinion of the State's expert witness that the contamination on Martineau's trousers originated from the interior of the victim's automobile.

(4) Martineau's shoes. Martineau's shoes were taken Tuesday, February 10. Two blood stains were found on the left shoe, and one on the right shoe. Fiber particles removed from Martineau's shoes were compared with fibers of the floor mats of the victim's automobile. Based on this comparison, the State's expert testified that Martineau's shoes had been in contact with one or more of the floor mats of the victim's automobile.

All of the above evidence taken from the petitioners while in custody, while prime suspects and while being denied the assistance of counsel, was admitted into evidence in the trial.

Based on the record, the Court additionally finds the following to be fact:

On February 11, 1959, petitioner Nelson was interviewed twice by Rhode

Island Attorney General J. Joseph Nugent. Petitioner Nelson had previously requested counsel, but these interviews were conducted in the absence of counsel for the petitioner. The first interview took place about 12:30 P.M. and continued until about 1:05 P.M. The second interview took place about 3:00 P.M. the same afternoon. Attorney General Nugent testified at the trial as to petitioner Nelson's statements to him during the interviews. He testified that he had warned petitioner of his right to be silent at the second interview (Transcript, Volume IX, P. 87). There is no indication that such a warning was given at the first interview.

The trial court ruled that the petitioner's extra-judicial statements in these interviews were admissible in evidence as "admissions" and as showing "consciousness of guilt." (Transcript, Volume IX, P. 80). The Prosecutor noted that this was the basis on which testimony about the statements was offered. (Transcript, Volume IX, P. 80).

Attorney General Nugent testified to the first interview as follows:

"A. Russell Nelson told me during the course of the first conversation that he wanted to talk about what had happened with relation to Mr. Gagnon's death. * * * "

"A. But he told me that he did not want to make a statement to me and end up getting a 30 or 40 year sentence of which he would have to serve 20 or 30 years. He told me that he'd rather jump out that window and put his head in the sewer rather than get that length of sentence. He further told me during the course of the first conversation I had with him that he did not want to talk about it and involve Martineau. I had known Nelson for a few years and knew his background, and I encouraged him to talk to me about what had happened. I told him as the first conference was concluding that I was going to be around for a while that afternoon, that I was then going out to lunch, and that if he wanted to talk about what had happened with reference to Mr. Gagnon's death I would be glad to come in and talk to him again.

"Q. Did he ask you any questions, General?

"A. He asked me—for example, he asked me have they found the gun during the course of the first conversation.

"Q. Was there anything else in his first conversation that related to the death of Maurice Gagnon that he said?

"A. He said a lot of things about why he was there in Nashua and about things that had happened to him down in Providence, Rhode Island.

"Q. Is there anything else about the actual death of Maurice Gagnon at this time?

"A. During the course of the first conference?

"Q. Yes, sir?

"A. The only significant part of the first conference that I can remember involves the statement that, as I understand it, has been ruled out by Judge Grimes." (Transcript, Volume IX, P. 84–86)

The witness testified to the second interview as follows:

"Q. All right, General Nugent. At sometime later on the 11th did you have occasion to talk again with Russell Nelson?

"A. Yes, sir.

"Q. When did that happen?

"A. Approximately 3:00 o'clock that afternoon. Colonel Stone and I —Colonel Stone is the Superintendent of the Rhode Island State Police —went into the cell tier where Nelson had been confined, together, and Nelson was taken out of the cell where he'd been confined and brought into this little room where I had conferred with him from ap-

proximately 12:30 noon until around 1:05. I said to Russell Nelson——."

\* \* \*

"A. I said to Russell, 'You know Colonel Stone, don't you?' He said yes. I said, 'Colonel Stone told me he used to work with your father and he'd like to talk to you.' Colonel Stone did talk to Russell Nelson in my presence for approximately four or five or six minutes, during which time Russell Nelson didn't say one word to Colonel Stone. At the conclusion of Colonel Stone's statements to Russell, Russell Nelson said to Colonel Stone, 'I don't want to be rude with you, Colonel, but I would like to talk to Mr. Nugent alone.' With that, the Colonel left the room where we were in and went out, and I conferred again alone with Russell Nelson. He said, as soon as Colonel Stone left the room—and I believe he called me Joe during the second conference I had with him—he said, 'Joe, I've been thinking about what you said. Things are going back and forth in my mind. I'd love to talk about it, but before I do I'd like to have an opportunity to talk with Martineau.' He said, 'By the way, can I talk to you as a lawyer rather than as the Attorney General or District Attorney of Rhode Island?' I told him no, that anything he said to me during the course of that conversation and the preceding conversation may be used against him at a later time. However, as a result of his request that he be permitted to speak to Martineau, I left the room, and I made an arrangement with Chief Regan and I believe with those oher police authorities who were in the room at that time so that Nelson could confer with Martineau, and he did.

"Q. And did you have any further conversations with him after that at any time?

"A. Immediately after the conversation was concluded between Nelson and Martineau, Colonel Stone went to the cell block where Nelson was confined—

"Q. (Interposing) Were you—

"A. (Interposing) With me there right at the door, and in my presence Colonel Stone said to Nelson——"

\* \* \*

"Q. Did you just not say, General Nugent, that Colonel Stone said something to Nelson in your presence?

"A. In my presence, yes. Colonel Stone went back to the—and me—and I, rather, went back to the cell block where Nelson was taken after the conversation between Martineau and Nelson was concluded, and Colonel Stone said to Nelson in my presence, at that cell block where Nelson was—'Do you want to talk now?' And he said, 'I've got nothing further to say.'

"Q. Is that all he ever said to you?

"A. He never spoke to me from that day to this day." (Transcript, Volume IX, P. 86–89)

At the time of the first interview, petitioner Nelson had been in custody for fifty-nine and one-half hours and was a prime suspect in connection with the death of Maurice Gagnon.

## CONCLUSIONS OF LAW

1. *The taking by police of petitioners' clothing while they were under detention, for the purpose of subjecting it to scientific scrutiny, was a search and seizure within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution.*

■■ No literal or mechanical approach should be adopted in determining what may constitute a search and seizure. See Lanza v. State of New York, 370 U.S. 139, 142, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). However, it is clear from the language of the Fourth Amendment [4]

---

4. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated \* \* \*."

that the person of an accused is within the amendment's protection.

█ In one sense, there was no "search" here before the police asked the petitioners to remove their clothes. That is, the clothes were readily visible, and the police did not have to search *for* them. But it is obvious from the record that the police desired to scrutinize the clothes for evidence which might connect petitioners with the crime then under investigation. This could be most readily accomplished if the clothes were removed from the petitioners' persons and turned over to scientific investigators.

Reason seems to require that such a taking from petitioners' persons be classed as a "seizure" by the authorities. Certainly, the police had no property right in the clothes and no argument has been advanced for the taking other than investigatory necessity.

2. *At the time the clothes were taken from petitioners, they were being detained in violation of the New Hampshire law of arrest, NH RSA ch. 594.*

In New Hampshire, the legality of detention and arrest is governed by statute, NH RSA ch. 594. The facts of this case indicate that the police, however well intentioned and sincere in attempting to solve a major crime, nevertheless failed to follow the statute from the beginning of petitioners' detention.

Petitioners were first taken into custody under NH RSA 594:2 [5] which entitles police to question and detain suspects for a maximum of four hours. RSA 594:2(c) provides that such detention shall not constitute an arrest and shall not be recorded as such in any official record. Yet, the evidence indicates that when petitioners were taken into custody, an "Arrest Record" was made out for each of them, listing in the space provided for "charge" the word "questioning." [6]

The police failed to release petitioners at the end of four hours. The four hour period expired for petitioner Nelson at 5:05 A.M. on February 9, 1959, and expired for petitioner Martineau at 7:55 A.M. the same day. The crime for which petitioners were later charged was not discovered until 11:55 A.M. that day. It is clear, then, that from and after 5:05 A.M. in the case of petitioner Nelson, and from and after 7:55 A.M. in the case of petitioner Martineau, the police detained them without authority for some period of time. Nelson's clothes were taken from him at 2:00 P.M. on February 9th. Martineau's clothes were taken at 4:00 P.M. on February 9th and on the morning of February 10th. The issue is: did anything occur in the meantime which changed the nature of petitioners' detention?

The State concedes that there was at some time at least a technical violation of the New Hampshire law of arrest, but it asserts that petitioners were under lawful detention at the time the clothes were taken.

█ First, the State points to a change in the petitioners' arrest records: at some time, the words "S.P. of Felony" [7] were substituted for the "Questioning" in the spaces on the arrest records providing for entry of the

---

5. "594:2 Questioning and Detaining Suspects.
  "(a) A peace officer may stop any person abroad whom he has reason to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and whither he is going.
  "(b) Any person questioned as provided in subsection (a) who fails to identify himself and explain his actions to the satisfaction of the peace officer stopping him may be detained and further questioned and investigated.

  "(c) In no case shall the total period of detention provided for by subsections (a) and (b) exceed four hours. Such detention shall not constitute an arrest and shall not be recorded as such in any official record. At the end of any such detention period the person so detained shall be released unless arrested and charged with a crime."

6. See Note 1, supra.

7. The Court understands "S.P. of Felony" to mean "suspicion of felony."

charge. But the Court concludes that such a change is insufficient to alter petitioners' status at the time their clothes were taken, for two reasons: (1) it is impossible for the Court to determine whether the changes in the arrest records were made before or after the clothes were taken. The State reserved the right to introduce evidence in this regard, but has failed to do so. (2) Even if the changes were made prior to the time petitioners' clothes were taken, such changes would be insufficient to justify continued detention under New Hampshire law. The Court concludes that a charge of "suspicion of felony" cannot serve as the basis for valid arrest in New Hampshire. NH RSA 594:1 defines "arrest" as the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime. But the words "suspicion of felony" charge no crime under New Hampshire law, as far as the Court has been able to determine. Furthermore, the detention of "suspicious persons" as regulated by NH RSA 594:2 requires that a detainee be released at the end of four hours, or be arrested and *charged with a crime*.[8] [Emphasis added.] Upon the foregoing, the Court concludes that a charge of "suspicion of felony" is insufficient grounds to justify arrest or detention beyond a four hour period, under New Hampshire law.

■ The State, however, argues that there is an additional, distinct circumstance here which transmuted an unauthorized detention of petitioners into a valid arrest and detention at the time their clothes were taken. The State would have it that the finding of the victim's body entitled the police to continue petitioners in custody. It may be that this circumstance, coupled with other information known to the police at the time, might have amounted to reasonable cause to arrest petitioners on a charge of murder. But the fact remains that the police did not follow this course. The most that can be said is that they amended petitioners' arrest records, substituting a charge which would be insufficient to sustain an arrest and continued detention under New Hampshire law. And, as noted, it is unclear whether even this was done prior to the time petitioners' clothes were taken from them. Nor is there any evidence to indicate that petitioners were informed at the time of any change in their status. The Court, therefore, concludes that the detention of the petitioners, unauthorized by New Hampshire law, which began at 5:05 A.M. February 9th in the case of petitioner Nelson and at 7:55 A.M. that day in the case of petitioner Martineau, continued to and through the time petitioners' clothes were taken from them later in the afternoon of February 9th.

■ The next morning, February 10th, petitioner Martineau's shoes were taken from him. In the interim, the chief of police had sought permission from the Municipal Court under NH RSA 594:23 [9] to continue the detention of petitioners "now in my custody on suspicion of having committed a crime" for an additional forty-eight hours.[10] Permission was granted. However, such permission cannot be construed as validating an otherwise unlawful detention, since the statute only authorizes extension as to persons "arrested," and the Court has previously noted that petitioners had not been "arrested" in a manner contemplated by the arrest law.

One other point is worthy of mention at this juncture. If, as the State contends, petitioners had been placed under

---

8. See Note 5, supra.

9. "594:23 Length of Detention. If not otherwise released, every person arrested shall be brought before a magistrate within twenty-four hours from the time of his arrest, Sundays and holidays excepted, unless a justice of the municipal court of the town or city where he is detained or of the town or city where the crime was committed for good cause shown orders that he be held for a further period of not exceeding forty-eight hours."

10. See Note 3, supra.

arrest, NH RSA 594:15 and 594:16 [11] imposed upon the police the positive duty to obtain the names of persons whom petitioners desired to be notified, to notify such persons and to permit them to confer with the petitioners at all reasonable hours. The facts clearly indicate that the police failed in this duty until sometime around noontime on February 11, 1959. This failure can mean one of two things: either that the police did not consider the petitioners to have been arrested or that, if they did, they failed in a clear duty imposed by law.

3. *The taking by police of petitioners' clothing, occurring at a time when petitioners were under detention not authorized by New Hampshire law, was an unreasonable search and seizure barred by the Fourth and Fourteenth Amendments to the United States Constitution.*

█ The Court is aware of the United States Supreme Court's recognition that standards of reasonableness are not susceptible to "Procrustean Application" and that the States are not precluded from developing working rules governing arrests and searches and seizures to meet the practical demands of criminal investigation. Ker v. State of California, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

█ But such "working rules" devised by the States may not fall below Constitutional minima if they are to be given recognition. And where the State has, through legislation, developed rules governing arrests, but where police have failed to follow such rules when dealing with persons under detention, the actions of the police should properly be subject to close scrutiny. And while no hard and fast definition of "reasonableness" can be adopted, at least it is clear that the presence of a warrant, or of a lawful arrest is indicative that a search and seizure incident thereto will be classed as reasonable. See Ker v. State of California, supra. Conversely, where persons are subjected to search and seizure conducted in the absence of a warrant, while they are being unlawfully detained, careful scrutiny is again in order.

█ In the present case, at the time the searches and seizures took place, the petitioners had been deprived of nearly every protection provided for them by the New Hampshire Legislature when it enacted NH RSA ch. 594. They had been booked when first taken into custody under § 594:2, in violation of that section. They were detained beyond the four hour period provided in that section. No proper charge was lodged against them for more than two days following their initial detention. They were not permitted to contact anyone, nor consult with counsel.

The search and seizure was not conducted pursuant to a warrant; the search and seizure was not incident to an arrest or detention which conformed to New Hampshire law; nor is there anything to recommend the reasonableness or necessity of the police procedure here. To approve it would license the police to disregard the limits placed on their powers, to take anyone they saw fit into custody, keep him in detention, and subject his person to a search and seizure for the purpose of gaining evidence against him. The Court believes that such police action would involve a too permeating police surveillance which the designers of the Constitution seemed to think was a greater danger to a free people than the escape of some criminals

11. "594:15 Notice of Arrest. The officer in charge of a police station to which an arrested person is brought shall immediately secure from the prisoner, if possible, the name of the parent or nearest relative, or friend or attorney with whom the prisoner may desire to consult, and immediately notify such relative, friend or attorney of the detention of the prisoner, when possible. Notice shall be given by telephone or messenger when practicable.

"595:16 Conference with Friends or Counsel. Such officer shall permit the prisoner to confer with his relatives, friends and attorney at all reasonable times."

from punishment. United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

In coming to this conclusion, the Court assumes that the Nashua police were acting in good faith in their attempt to get to the bottom of a serious crime. But as the United States Supreme Court has recently noted, if good faith of the police alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects" only in the discretion of the police. Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

The Court is not declaring that police are constitutionally forbidden in every case from taking clothes of persons under detention and subjecting them to scientific scrutiny. Where persons are under valid detention, such procedure has been specifically approved. Robinson v. United States, 109 U.S.App.D.C. 22, 283 F.2d 508 (1960), cert. denied 364 U.S. 919, 81 S.Ct. 282, 5 L.Ed.2d 259 (1960); United States v. Guido, 251 F.2d 1 (7th Cir. 1958), cert. denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843 (1958). But, as noted, there was no valid detention in the present case.

■■■ The State contends, however, that even if the search and seizure here was unreasonable, petitioners handed over their clothing voluntarily and so waived their rights under the Fourth and Fourteenth Amendments to protest the taking. That such a waiver is possible is undoubtedly the law. E. g., Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). But it is also the law that clear evidence of waiver is necessary and the burden is on the party claiming waiver to prove it. A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit. See United States v. Page, 302 F.2d 81, 83 (9th Cir. 1962); United States v. Smith, 308 F.2d 657, 663 (2nd Cir. 1962); McDonald v. United States, 307 F.2d 272, 274 (10th Cir. 1962); Judd v. United States, 89 U.S. App.D.C. 64, 190 F.2d 649 (1951).

■■■ The evidence here shows that petitioners, while in custody, were taken from their cells to the inspectors' room for interrogation. There, the police made it known that they wanted the petioners' clothes. The petitioners removed their clothes and the police took them.

■■■ It is idle to contend that the circumstances under which these clothes were obtained would indicate an unequivocal, voluntary consent of petitioners to the taking. Police custody necessarily impairs, to some degree, the free will of persons under such detention. "Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact." United States v. Page, 302 F.2d 81, 84 (9th Cir. 1962). The Court does not believe that the evidence here is enough to show a conscious, voluntary waiver by petitioners of their rights under the Fourth and Fourteenth Amendments. At most, the evidence shows a submission to authority, which is not sufficient to constitute consent. See Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

4. *Petitioners were deprived of Due Process of Law because the fruits of unreasonable searches and seizures were admitted into evidence at their trial.*

At the trial of petitioners, the clothing which had been taken from them was admitted into evidence. There was also testimony by Carroll A. Durfee and Dr. Harold C. Harrison as to the results of scientific tests they had conducted on the clothing.

■■■ Under the rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), due process of law requires State courts to exclude evidence which stems from an unreasonable search and seizure. The Circuits are in conflict over whether or not the Mapp doctrine should be applied retrospectively to a case which went to final judgment before the Mapp decision was handed down. Compare Hall v. Warden, 313 F. 2d 483 (4th Cir. 1963), cert. denied sub

nom. Pepersack v. Hall, 374 U.S. 809, 83 S.Ct. 1693, 10 L.Ed.2d 1032 (1963), and People of State of California v. Hurst, 325 F.2d 891 (9th Cir. 1963), petition for cert. filed March 13, 1964, with United States ex rel. Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1963), cert. granted 377 U.S. 930, 84 S.Ct. 1340, 12 L.Ed.2d 295 (1964); Sisk v. Lane, 331 F.2d 235 (7th Cir. 1964); United States ex rel. Angelet v. Fay, 333 F.2d 12 (2nd Cir. 1964), cert. granted 379 U.S. 815, 85 S.Ct. 126, 13 L.Ed.2d 28 (1964); Gaitan v. United States, 317 F.2d 494 (10th Cir. 1963).

■ Troublesome as this dispute may be, its resolution will not necessarily govern the present case, for it is the Court's view that no final judgment was arrived at in the present case prior to the Mapp decision. Petitioners were convicted on November 14, 1959. Their exceptions were overruled by the New Hampshire Supreme Court on November 30, 1961, State v. Nelson, at 103 N.H. 478, 175 A.2d 814. They moved in the trial court for a new trial under NH RSA ch. 526 on October 28, 1962. The denial of this motion was affirmed by the New Hampshire Supreme Court on December 20, 1963, at 105 N.H. 184, 196 A.2d 52.

The opinion in Mapp was rendered on June 19, 1961, prior to decision by the New Hampshire Supreme Court on petitioners' bill of exceptions and prior to that court's decision on petitioners' motion for a new trial. On these facts, the Court concludes that final determination of the controversy between the State and the petitioners did not occur until after the decision in Mapp v. Ohio, and, hence, no retrospective application is required for Mapp to control in this case.

Petitioners' appeal on their bill of exceptions was pending at the time of the Mapp decision. Although it can be argued that no issues relating to search and seizure were raised on that appeal, such issues were raised in petitioners' later motion for a new trial. And, in New Hampshire, it has been held that as long as a judgment is subject to challenge by motion for a new trial, it is not absolutely final. Watkins v. Boston & Maine R.R., 81 N.H. 363, 127 A. 701 (1924).

"Between the entry of judgment and the granting of the new trial [the judgment] was subject to being vacated, which shows its necessary lack of finality. While it was final, unless something happened to it, that qualification made its finality conditional rather than absolute. There may be a period of apparent and assumed finality, sufficient to justify execution on it, but it is not actual and real while the rights of the defeated party to attack its validity can be successfully maintained.

"The petition for a new trial is a separate proceeding only in the manner it is brought. Substantially it not only relates to but is a part of the original action. That it begins as a separate proceeding when brought after judgment is entered does not make it an independent one and does not affect its essential connection as incidental and belonging to the original action." 81 N.H. 366, 127 A. 703.

■ Applying the above statement to the present case, the Court concludes that a motion for new trial is an ordinary post-conviction remedy in New Hampshire and no judgment of conviction is truly final in the State courts until disposition of such a motion. Accordingly, petitioners' convictions did not become final until December 20, 1963, when the State Supreme Court denied their motion, well after the appearance of Mapp v. Ohio, supra. The Mapp decision, occurring as it did while the petitioners' case was within the ordinary process of appeal in the State courts, is applicable here. See United States ex rel. Carafas v. LaVallee, 334 F.2d 331 (2nd Cir. 1964), petition for cert. filed August 31, 1964; United States ex rel. West v. LaVallee, 335 F.2d 230 (2nd Cir. 1964).

Even if Mapp had not preceded final judgment in this case, pending the resolution of the above-noted conflict by the United States Supreme Court, this Court would be disposed to follow the well-reasoned opinion of the majority in Hall v. Warden, supra, and Tuttle, C. J., dissenting in State ex rel. Linkletter v. Walker, supra.

In the Hall case, petitioner's conviction had been affirmed and finalized prior to the Mapp decision. In spite of this circumstance, Boreman, J., speaking for the court held that the Mapp decision applied retrospectively. In substance, he questioned whether, if the protections of Mapp are present now, were they not present when the petitioners here were tried and convicted.

> "An affirmative answer would appear to be inescapable." P. 495 of 313 F.2d.

Tuttle, C. J., dissenting in State ex rel. Linkletter v. Walker, supra, stated at page 20 of 323 F.2d:

> "To me the most persuasive thought which leads me to conclude that the Supreme Court did not intend to restrict Mapp to prospective application is that it did not say so."

5. *The admission into evidence of Attorney General Nugent's testimony at the trial, relating the statements of petitioner Nelson made at their "first interview" at a time when Nelson was denied access to counsel, deprived petitioner Nelson of due process of law.*

In Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the United States Supreme Court held that where the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his right to remain silent, the accused has been denied "The Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as made obligatory upon the States by the Fourteenth Amendment, and that no statement elicited during the interrogation may be used against him at a criminal trial. 378 U.S. 490–491, 84 S.Ct. 1758 (1964).

The Court holds that the factual prerequisites as established in the Escobedo opinion are present in the instant case with respect to petitioner Nelson's "first interview" with Attorney General Nugent.

The State has argued that no "confession" is involved here, and that, therefore, the Escobedo case does not apply. However, it should be noted that the Escobedo opinion speaks of "incriminating statements," not confessions. Attorney General Nugent's testimony was allowed by the trial court as reporting "admissions" and statements showing consciousness of guilt. The Court cannot say that the jury did not consider them to be such and, therefore, concludes that the testimony reported incriminating statements.

However, since the trial court carefully instructed the jury that the statements were not to be considered against petitioner Martineau,[12] the Court cannot conclude that he was denied due process of law by their admission into evidence. While it might be argued that such an instruction by the trial court could not be effective to prevent prejudice to Martineau, the Court must assume that juries do follow judicial instructions, in the absence of conclusive evidence to the contrary. There is no such evidence here.

It is hardly necessary to point out that the foregoing findings in no way bear upon the guilt or innocence

---

12. The trial court so instructed the jury when the evidence was first admitted (Transcript, Volume IX, P. 83) and in the charge (Transcript, Volume XIV, P. 72), among other instances.

872

of the petitioners. It is axiomatic that habeas corpus proceedings deal only with the legality of a petitioner's confinement, and the Court's sole task in such proceedings is to determine whether this confinement is based on some deprivation of a petitioner's Constitutional right to due process of law.

### ORDER

Upon the foregoing, the Court is of the view that the writ of habeas corpus should issue in favor of petitioners, but that execution thereof should be stayed and held in abeyance pending indication by the State whether, within the period prescribed by Rule 73 of the Federal Rules of Civil Procedure, it desires to appeal these findings. If, at the expiration of the period prescribed by the Rule, no action looking to review has been taken, then a further order will be made, after opportunity to be heard has been given the parties. During the interim, the custody of the petitioners is to remain undisturbed.