NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2015-0404


THE STATE OF NEW HAMPSHIRE

v.

MAX WILSON

Argued: June 14, 2016
Opinion Issued: April 25, 2017


Joseph A. Foster, attorney general (Sean P. Gill, attorney, on the brief and orally), for the State.


Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.


HICKS, J. The defendant, Max Wilson, appeals his convictions, following a jury trial in Superior Court (Smukler, J.), on four counts of violating RSA 632-A:10 (2016), which prohibits persons convicted of certain offenses from providing child care services. We affirm in part, reverse in part, and remand.

The jury could have found the following facts. The defendant is a New Hampshire registered sex offender. At trial, the State and the defendant stipulated that the defendant had been convicted of a sexual assault, which is a qualifying conviction under RSA 632-A:10, I. He registered at least seven times between October 4, 2012, and December 27, 2013, each time acknowledging

that he could not "undertake employment or volunteer service involving the care, instruction or guidance of minor children." (Quotation omitted.)

Around 2012, the defendant moved in with a family with whom the victim's parents were friends. The victim was a friend of one of that family's children and became familiar with the defendant through spending time at their home. In addition, the victim's father attended Bible studies that the defendant taught at that family's home. The victim's father testified that the defendant "had mentioned that he had counseled boys in the past from church activities," and, in particular, had spoken of "previous encounters where he counseled troubled youngsters."

In January 2014, the victim was fourteen years old. The 2013 holiday season had been difficult, following the death of the victim's grandfather earlier in the year. When the victim's mother resumed homeschooling her children after the holiday break, she found the victim to be challenging and disruptive. The victim's parents discussed having the defendant help with the victim because he respected and looked up to the defendant.

The victim's father testified that he called the defendant on January 6, "and asked him if he would help [the victim] out and would do some [Bible] devotions with [the victim] and possibly help him with his schooling." He also "asked that they would be involved in different activities that would teach [his] boy manhood type principles."

On the morning of January 7, the defendant and the victim discussed the Bible over the telephone. Later that day, the defendant went to the victim's house in Hopkinton. They discussed ideas for woodworking projects and then the defendant drove the victim to Concord, where they went to a restaurant and worked on homework in the café area of a bookstore. They returned home and worked on models in the victim's room, after which the defendant stayed for dinner with the victim's family.

The victim's father testified that during the week following January 7, the victim "start[ed] to withdraw from . . . family activities." On January 9, the victim's father again called the defendant and shared his concern that the victim was "drifting away." He indicated that he and the victim's mother "wanted to make sure that [the victim] was being put back and pushed towards his parents as the authority figures in his life."

On January 10, the defendant called the victim and again discussed the Bible with him over the telephone. The defendant later went to the victim's house and worked on models with the victim in his room. That day, the defendant also took the victim shopping in Concord.

2

Also on January 10, the victim's mother, according to her testimony, "had an uneasiness that [she] could not put [her] finger on" regarding the defendant's relationship with the victim and shared her concern with her two older daughters. One of the daughters searched the defendant's background on her computer and discovered that he is a registered sex offender. The victim's father then terminated the defendant's contact with the victim.

The defendant was indicted on four counts of violating RSA 632-A:10, which provides, in pertinent part:

> A person is guilty of a class A felony if, having been convicted in this or any other jurisdiction of any felonious offense involving child pornography, or of a felonious physical assault on a minor, or of any sexual assault, he knowingly undertakes employment or <u>volunteer service involving the care, instruction or guidance of minor children</u>, including, but not limited to, service as a teacher, a coach, or worker of any type in child athletics, a day care worker, a boy or girl scout master or leader or worker, a summer camp counselor or worker of any type, a guidance counselor, or a school administrator of any type.

RSA 632-A:10, I (emphasis added). The jury returned a guilty verdict on each felony count. The court imposed the following sentences: on the first conviction, seven-and-one-half to fifteen years of imprisonment; on each of the second, third, and fourth convictions, a period of incarceration to run consecutively to the sentence on the preceding conviction. In addition, the record establishes that the defendant pleaded guilty to charges of sexually assaulting the victim while volunteering to provide him care, instruction or guidance, although it is unclear whether there were two or three such charges and pleas.

On appeal, the defendant argues that the trial court erred in: (1) denying his motion to dismiss for insufficient evidence; (2) denying his motion to dismiss on grounds that "RSA 632-A:10, I, is void for vagueness, either facially or as applied"; and (3) "entering multiple convictions or imposing multiple punishments." The defendant advanced a fourth issue in an assented-to motion to add issues, which we granted; however, because the defendant failed to brief that issue, we deem it waived. See State v. Blackmer, 149 N.H. 47, 49 (2003).

## I. Sufficiency of the Evidence

We first address the defendant's sufficiency of the evidence argument. "A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is <u>de novo</u>." State v. Collyns, 166 N.H. 514, 517 (2014). Our standard for reviewing the denial of a defendant's motion to

dismiss for insufficiency of the evidence is well settled.  State v. Fandozzi, 159 N.H. 773, 781-82 (2010).  To prevail upon his challenge to the sufficiency of the evidence, the defendant must establish that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt.  Id. at 782.

The defendant's insufficiency argument is based upon his interpretation of the phrase "volunteer service" in RSA 632-A:10, I, as "encompass[ing] only formal services performed for a volunteer organization."  The State conceded at trial that it had produced no evidence that the services the defendant undertook to provide in alleged violation of RSA 632-A:10, I, were provided through or for an organization.  Accordingly, the claim of error on appeal turns upon an issue of statutory interpretation.  See Collyns, 166 N.H. at 518.

> In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole.  We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice.  We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  We must give effect to all words in a statute, and presume that the legislature did not enact superfluous or redundant words.  Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation.

Id. (quotations and citations omitted).

The defendant argues that the plain and ordinary meaning of "volunteer service" does not encompass all unpaid activity, but, rather, "is limited to activity provided through an organization."  He contends that engaging in any unpaid activity may be described as "volunteering," but that "volunteer service" connotes something more; namely, acting through an organization.  He asserts that "this intuitive, common-sense understanding of the word 'volunteer' is confirmed by the legislature's definition of the word in two other statutes" and "is reflected in statutes outside of New Hampshire as well."

We are not persuaded.  First, the term "volunteer" in RSA 632-A:10, I, modifies the term "service."  Thus, definitions of the term "volunteer," standing alone, are inapposite.  Additionally, while "[i]t is a general rule," in construing our own statutes, that "different statutes relative to the same subject[] are to be construed together," Sloan v. Bryant, 28 N.H. 67, 71 (1853), we decline to import into RSA 632-A:10, I, a definition of "volunteer" contained in a statute dealing with different subject matter.  Thus, we find the defendant's citations to

4

RSA 508:17 (2010) (providing immunity from civil liability to volunteers of nonprofit organizations and government entities) and RSA 161-F:49 (2014) (establishing a registry for founded reports of abuse, neglect, or exploitation against certain adults eligible for services on the bases of, among other things, mental illness or physical or developmental disability) unavailing. We are even less inclined to look to inapposite statutes from other jurisdictions.

The defendant next relies upon three canons of statutory construction to support his interpretation. The first is the principle of ejusdem generis, which we have stated "provides that, where specific words in a statute follow general ones, the general words are construed to embrace only objects similar in nature to those enumerated by the specific words." State v. Meaney, 134 N.H. 741, 744 (1991).

The State questions our expression of the ejusdem generis principle in Meaney and similar cases, observing that the doctrine has been "traditionally understood and applied" in the opposite presentation; that is, where general words follow a specific enumeration. See, e.g., In the Matter of Preston and Preston, 147 N.H. 48, 51 (2001). The State also argues that the legislature's "use of the phrase 'including, but not limited to,' in RSA 632-A:10, I, demonstrates that the terms that follow are offered in illustration, not limitation." The State's contentions have some support in case law outside New Hampshire. See, e.g., NISH v. Rumsfeld, 348 F.3d 1263, 1268 (10th Cir. 2003) ("Because ejusdem generis is only to be applied to determine the scope of a general word that follows a specific term, that canon has no relevance here."); People v. Roggow, 318 P.3d 446, 450-51 (Colo. 2013) (noting, in interpreting statute criminalizing child sexual assault by persons "in a 'position of trust' includ[ing], but . . . not limited to" certain defined categories of persons, that the "[t]he phrase 'includes, but is not limited to' suggests an expansion or enlargement and a broader interpretation" and concluding that "the statutory definition makes plain that the examples listed are only illustrative." (quotations omitted)). Nevertheless, we need not reexamine our ejusdem generis jurisprudence to decide this case, and we decline, at this juncture, to do so. We will assume the defendant's contention — that the doctrine may be applied where, as here, the statutory language progresses from a general description to a specific enumeration and where the legislature has used the phrase "including, but not limited to." RSA 632-A:10, I.

The defendant asserts that all of the specific examples of persons included within the prohibition of RSA 632-A:10, I, are "persons who engage in activity either (a) for pay, or (b) as . . . volunteer[s] for an organization." He notes that "[t]he statute even lists several types of organizations[:] the Boy Scouts and Girl Scouts, 'a summer camp' and 'a school.'" He then argues that, "[u]nder the principle of ejusdem generis, this Court should thus construe 'volunteer service' as encompassing only activity that is similar to the

5

enumerated roles, specifically activity that is either (a) paid or (b) conducted through an organization."

We reject the premise that the relevant similarity of the services specifically enumerated in RSA 632-A:10, I, is that the services describe "persons who engage in activity either (a) for pay, or (b) as . . . volunteer[s] for an organization."

> The basis of the ejusdem generis rule is that the mention of one thing followed by a general descriptive term gives color and meaning to the class covered by the latter and limits that class to the things having a likeness to the specified thing. The likeness contemplated by the rule, however, is as to characteristics material to the purpose of the classification.

State v. New Hampshire Gas & Electric Co., 86 N.H. 16, 25 (1932) (emphasis added); see also State v. Small, 99 N.H. 349, 351 (1955) (noting that "the rule of ejusdem generis is neither final nor exclusive and is always subject to the qualification that general words will not be used in a restricted sense if the act as a whole indicates a different legislative purpose in view of the objectives to be attained"). Thus, even assuming, without deciding, that the specific examples enumerated in RSA 632-A:10, I, describe only "persons who engage in activity either (a) for pay, or (b) as . . . volunteer[s] for an organization," we cannot mechanically use that characteristic under the ejusdem generis doctrine without examining the purposes of the classification and of the statute itself. See State v. Beckert, 144 N.H. 315, 318-19 (1999) (refusing to apply ejusdem generis so as to "read [a] statute with blinders" and rejecting contention "that the specific weapons enumerated in RSA 159:3 represent instruments of combat per se and that the catch-all category of 'other dangerous weapon' must be similarly limited," where "RSA 159:3 was expressly intended to protect the public from felons who would possess instruments capable of causing serious injury or death" and the hunting knife at issue was such an instrument).

The legislature stated the purpose of RSA 632-A:10 in the enacting legislation:

> The general court recognizes that those who seek to exploit and abuse children often attempt to create opportunities for themselves to do so by seeking to perform services of one type or another in a field involving the care or training of children. The public policy of the state demands that these people be denied such opportunities.

Laws 1988, 257:1; see Flood Control Dist. v. Paloma Inv. Ltd., 350 P.3d 826, 831 (Ariz. Ct. App. 2015) ("When the legislature specifies the statute's applicability or purpose in the session law that contains the statute, it is

6

appropriate to interpret the statutory provisions in light of that enacted provision."); Carter v. Dept. of Veterans Affairs, 135 P.3d 637, 644 (Cal. 2006) ("Although . . . statements [of intent] in an uncodified section [of statute] do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute."); cf. Velishka v. Nashua, 99 N.H. 161, 165 (1954) (noting, with respect to statute empowering housing authorities to acquire property for redevelopment projects by eminent domain, that while "legislative findings and declarations [of purpose] have no magical quality to make valid that which is invalid[,] . . . they are entitled to weight in construing the statute and in determining whether the statute promotes a public purpose under the Constitution"). This stated purpose does not use the terms "employment" or "volunteer service," RSA 632-A:10, I, and evinces no intent to restrict the type of entity through which the covered services must be performed. It does, however, describe the subject services as those "involving the care or training of children." Laws 1988, 257:1; cf. RSA 630-A:10, I (using phrase "involving the care, instruction or guidance of minor children"). We find the use of the phrase "involving the care . . . of . . . children," RSA 630-A:10, I, Laws 1988, 257:1, to be indicative of a legislative focus upon services that by their nature provide access to children. The service providers listed in RSA 630-A:10, I — "a teacher, a coach, or worker of any type in child athletics, a day care worker, a boy or girl scout master or leader or worker, a summer camp counselor or worker of any type, a guidance counselor, or a school administrator of any type," RSA 630-A:10, I — all share the characteristic of providing such access. Cf. Roggow, 318 P.3d at 450 (concluding that categories enumerated in sexual assault statute "reflect the General Assembly's overarching intent to target those offenders who are entrusted with special access to a child victim and who exploit that access to commit an offense against the child"). Moreover, that characteristic directly relates to the legislative purpose of denying persons "who seek to exploit and abuse children . . . opportunities . . . to do so." Laws 1988, 257:1.

Thus, even assuming that the services listed in RSA 630-A:10, I, also happen to share the characteristic of being provided through organizations, we do not find that characteristic to be "material to the purpose of the classification" in the statute. New Hampshire Gas & Electric Co., 86 N.H. at 25. Rather, we conclude that the restrictive interpretation of "volunteer service" urged by the defendant would frustrate the legislature's expressed intent by allowing to "slip through the cracks" some child predators who create opportunities to abuse or exploit children by engaging in unpaid service involving the care, instruction or guidance of minor children. The defendant would have us conclude that the legislature intended to prevent abuse by a registered sex offender who volunteers as a church choir director, but not by an offender who offers to give free piano lessons to the child next door, or to deter exploitation by an offender who has unsupervised access to a child through the Big Brother/Big Sister organization, but not by an offender who periodically babysits a neighbor's child without pay. Such an intent is

7

inconsistent with the statute's broadly stated purpose.  See Laws 1988, 257:1.  Thus, because the characteristic urged by the defendant — that the services be provided through an organization — is not "material to the purpose of the classification," New Hampshire Gas & Electric Co., 86 N.H. at 25, we conclude that the doctrine of ejusdem generis does not support the defendant's interpretation.

The defendant next argues that the trial court's interpretation violates the interpretive canon that the "legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect."  In re Search Warrant (Med. Records of C.T.), 160 N.H. 214, 221 (2010) (quotation omitted).  Specifically, the defendant contends that, under the trial court's interpretation, the statutory language, "undertakes employment or volunteer service involving," RSA 632-A:10, I, is superfluous.  Asserting that "[a]ll activity is either paid or unpaid," the defendant argues that the meaning of the statute, as interpreted by the trial court, "is exactly the same as if [it] read 'A person is guilty of a class A felony if, having been convicted [of a qualifying offense], he knowingly provides care, instruction or guidance to minor children.'"  He thus argues that the trial court's interpretation impermissibly changed the meaning of the statute.  We disagree.

We explain our reasoning by reference to an argument the defendant makes elsewhere in his brief.  The defendant asserts that the "prohibition in RSA 632-A:10, I, is broad" and notes, "for instance, [that it] does not exclude from its reach the parent of the child who is provided care, instruction or guidance."  He then argues that a parent with a qualifying conviction "would be legally required to limit the care, instruction and guidance to that required under their [parental] duty of care" because "[a]ny care, instruction or guidance beyond that legally required [of the parent] would constitute 'volunteer service' and thus would run afoul of the statute."

The statute, however, cannot be as broadly interpreted as the defendant asserts, in part, because the very language he contends is superfluous prevents it from being so interpreted.  Continuing with the defendant's parent-child example, we note that only a strained and unnatural construction of "volunteer service," RSA 632-A:10, I, would permit that term to describe a parent's provision of care, instruction, or guidance to his own child.

> [P]arents generally have the right, coupled with the high duty, to recognize and prepare their children for additional obligations.  The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

8

<u>Troxel v. Granville</u>, 530 U.S. 57, 68 (2000) (plurality opinion) (quotations, brackets, and ellipsis omitted). Even were it possible to discern at what point the "high duty" of parental care is satisfied, such that any provision of care, instruction, or guidance beyond it could be considered something over and above that duty, we would still presume such action to spring from the parent's "natural bonds of affection" for the child, <u>id</u>., and, therefore, would not consider it to be "volunteer service," RSA 632-A:10, I. Thus, as this example demonstrates, the phrase "volunteer service" acts to limit the activities that fall within the statutory prohibition and is not superfluous. RSA 632-A:10, I. Accordingly, we reject the defendant's superfluous language argument.

The defendant next contends that "this Court will not interpret a statute to create absurd results." The defendant begins with the premise, noted above, that the "prohibition in RSA 632-A:10, I, is broad," and he then posits a number of hypothetical examples to which application of the trial court's interpretation of RSA 632-A:10, I, would lead, in the defendant's view, to absurd results. The defendant concludes that "the plain language of the phrase 'volunteer service' as used in RSA 632-A:10, I, includes only activity that is volunteered through an organization." We disagree.

"It is a fundamental principle of statutory construction that whenever possible, a statute will not be construed so as to lead to absurd consequences. Thus, as between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted." <u>Appeal of Marti</u>, 169 N.H. 185, 190 (2016) (quotations omitted). This fundamental principle does not avail the defendant, however, because the interpretation he proffers is itself unreasonable. <u>See</u> <u>Bovaird v. N.H. Dep't of Admin. Servs.</u>, 166 N.H. 755, 763 (2014) (declining to construe legislation as urged by petitioner, where "it is the petitioner's interpretation that could lead to absurd results"). To be sure, the defendant's construction would narrow the scope of a statute he believes to be too "broad," but, as noted previously, it would render the statute underinclusive of the perils the legislature sought to remedy — the creation, by persons "who seek to exploit and abuse children[,] . . . [of] opportunities . . . to do so by seeking to perform services of one type or another in a field involving the care or training of children." Laws 1988, 257:1.

The defendant appears to suggest that, unless the term "volunteer service" is construed to apply only to services provided through an organization, the statute could conceivably criminalize every interaction between a person with a qualified conviction and a child. We disagree. As indicated by the foregoing discussion of the defendant's "'service' by parents" argument, other terms in the statute act to limit such an application. Thus, it is by no means either an obvious or foregone conclusion that the statute would apply to innocuous, chance encounters between a person with a qualifying conviction and a child. We note that, although the defendant bases his argument upon the premise that the "prohibition in RSA 632-A:10, I, is broad,"

he has not brought a constitutional overbreadth challenge and does not claim to fall within any of the hypothetical scenarios that he asserts would be absurd. We leave for another day, and a properly brought challenge, the question of whether the statute is in any respect unconstitutionally overbroad. Accordingly, we reject the defendant's absurd results argument.

The defendant further contends that: (1) "the legislative history [of RSA 632-A:10] demonstrates that the legislature intended the statute to apply only to either (a) employment, or (b) unpaid activity provided through an organization"; and (2) we should apply the rule of lenity to restrict the meaning of the term "volunteer service" to service through an organization. The applicability of both theories, however, is contingent upon the ambiguity of the statute in question. See ATV Watch v. N.H. Dep't of Transp., 161 N.H. 746, 752 (2011) (noting that we "will consider legislative history only if the statutory language is ambiguous" (quotation omitted)); State v. Jennings, 155 N.H. 768, 777 (2007) (noting that "the rule of lenity is applicable only where statutory ambiguity has been found" (quotation omitted)). Because the defendant has failed to show ambiguity in the statute, we reject his legislative history and rule of lenity arguments.

For the foregoing reasons, we reject the defendant's interpretation limiting "volunteer service" under RSA 632-A:10, I, to service provided through an organization. Because the statutory construction premise underlying the defendant's sufficiency of the evidence challenge fails, we conclude that he has failed to establish "that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." Fandozzi, 159 N.H. at 782 (quotation omitted).

## II. Vagueness

The defendant next argues that the trial court erred in denying his motion to dismiss based upon his assertion that RSA 632-A:10, I, is void for vagueness under the State and Federal Constitutions. The constitutionality of a statute is a question of law, which we review de novo. State v. Lamarche, 157 N.H. 337, 340 (2008).

"A party challenging a statute as void for vagueness bears a heavy burden of proof in view of the strong presumption favoring a statute's constitutionality." State v. White, 164 N.H. 418, 423 (2012). On appeal, the defendant advances both facial and as-applied challenges to the statute. The State argues, however, that the defendant failed to preserve a facial challenge for appeal. The State asserts that the defendant never argued before the trial court that RSA 632-A:10, I, was facially invalid, and that "[h]e told the trial court that he was challenging the statute as void for vagueness as applied." The defendant counters that he did assert a facial challenge, and that the State

10

relies upon transcript passages in which he was not "discussing his constitutional vagueness challenge."

"[W]e will not review any issue that the defendant did not raise before the trial court." Blackmer, 149 N.H. at 48. This preservation requirement, expressed in both our case law and Supreme Court Rule 16(3)(b), "reflects the general policy that trial forums should have an opportunity to rule on issues and to correct errors before they are presented to the appellate court." Holt v. Keer, 167 N.H. 232, 238 (2015) (quotation omitted). Thus, to resolve the State's preservation challenge, we examine how the vagueness issue was presented to the trial court.

At the close of the State's case, the defendant moved to dismiss, and submitted to the court a memorandum of law "regarding the scope of RSA 632-A:10." He set forth the same proposed interpretation urged here — that the term "volunteer services" means only services through an organization — and asserted both that "a broader construction of the term . . . would render the statute void for vagueness, and [that] the court must favor a constitutional limiting construction if it may reasonably do so." In the memorandum, he further stated that "[t]he phrase 'volunteer service' saves the statute from vagueness by limiting the statute's scope to formal volunteering for an organization. Without that limitation, the statute makes any sex offender a target for arrest if he or she so much as talks to a child." As examples of circumstances inviting such targeting, the defendant offered: "Helping a child cross the street is care of a minor child. Answering a question at a retail establishment is instruction. Giving directions is guidance."

On appeal, the defendant appears to contend that these examples demonstrate a facial challenge to the statute. We find the examples ambiguous at best, however, particularly in light of other portions of the defendant's memorandum. For instance, he noted that "the New Hampshire Supreme Court entertains facial challenges to a statute only where the statute implicates a fundamental right," yet he made no assertion that any fundamental right is implicated by the statute at issue.

The defendant also argues that "the [trial] court's order demonstrates that it considered and rejected [his] facial vagueness challenge." Specifically, he points to the following language in the order: "Unless a statute implicates a fundamental right, a defendant can only launch a vagueness attack as the statute is applied to him. . . . RSA 632:A:10 does not implicate a fundamental right. Thus, the defendant can only prevail on his vagueness claim as the statute applies to him."

We decline to read the trial court's order in the manner urged by the defendant. An equally plausible interpretation is that the trial court took the defendant's failure to allege an implicated fundamental right as a concession

11

that none existed.  Further indication that the trial court did not consider a facial challenge is provided by the defendant's own declarations that his void for vagueness challenge was as applied, not facial.  In arguing the motion to dismiss, the defendant's counsel stated: "And finally, I make a void -- on as applied, void for vagueness challenge . . . ."  Even if this statement, taken alone, could be read consistently with the defendant's assertion that he also raised a facial challenge, that interpretation is foreclosed by counsel's statement that "[t]his statute has been construed by one Superior Court Judge, and that was a facial challenge to the statute, which we are not making." (Emphasis added.)

The defendant now asserts that his counsel was not "discussing his constitutional vagueness challenge" when he made the second quoted statement, and, therefore, it "do[es] not indicate that [he] waived his facial vagueness challenge."  We are not persuaded.  Although the defendant attempts on appeal to distinguish his counsel's statutory interpretation argument from his constitutional argument, we are unable to conclude from the record that the trial court could not have reasonably understood the defendant to be disclaiming a facial challenge.  The defendant will not now be heard to complain "of the fact that the court ruled consistently with defense counsel's representations at" trial.  State v. Gay, 169 N.H. 232, 248 (2016).

The defendant nevertheless urges that, even if he failed to preserve a facial challenge, we "should still address it under the exception to the preservation requirement set forth in State v. Brown, 138 N.H. 649 (1994)."  In Brown, we stated, citing State v. Nelson, 105 N.H. 184, 190 (1963), that we had "recognized a limited exception to the preservation rule . . . when it would have been futile for the defendant to object under the law in effect at the time of trial."  Brown, 138 N.H. at 652 (quotation and brackets omitted).  The defendant here asserts that, although "under the law in effect at the time of trial, a facial vagueness challenge would have been futile," the United States Supreme Court subsequently altered the law of unconstitutional vagueness in Johnson v. United States, 135 S. Ct. 2551 (2015).

We decline to apply an "exception" to the preservation rule here.  We note that although we have described Nelson as "recogniz[ing] a limited exception to the preservation rule," Brown, 138 N.H. at 652, in fact, Nelson merely reflects the discretionary nature of our preservation rule.  See State v. Mouser, 168 N.H. 19, 28 (2015); Nelson, 105 N.H. at 190 (treating objections claimed to be not preserved at trial for murder "as if seasonably" made "[i]n view of the seriousness of the charges against these defendants" in addition to counsel's "understandable" failure to object in light of the law then existing).  We decline to waive our preservation rule in this case.

Because we hold that the defendant failed to preserve his argument that RSA 632-A:10, I, is unconstitutionally vague on its face, we consider only his

as-applied challenge.  We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).

"A statute can be impermissibly vague for either of two independent reasons: (1) it fails to provide people of ordinary intelligence a reasonable opportunity to understand the conduct it prohibits; or (2) it authorizes or even encourages arbitrary and discriminatory enforcement."  State v. Hynes, 159 N.H. 187, 200 (2009).  The defendant contends that RSA 632-A:10, I, is unconstitutionally vague on both grounds.  He first contends that even if he "understood the statute to prohibit some unpaid activity outside the scope of an organization, he had no way of knowing whether the victim's father's requests — helping [the victim] with Bible devotions and school work, counseling [the victim] and teaching [the victim] 'manhood type principles' — were among the prohibited activities."  We disagree.  The defendant's own description of his activities as comprising, among other things, "teaching" and "counseling" the victim demonstrates that they plainly "involv[ed] the care, instruction or guidance of [a] minor child[]."  RSA 632-A:10, I.  In other words, regardless of whether the terms "care, instruction or guidance" may arguably be vague in an abstract sense or hypothetical application, the defendant's as-applied challenge fails because his activities "fit[] within any reasonable understanding of th[ose] term[s]."  Farrell v. Burke, 449 F.3d 470, 490 (2d Cir. 2006).  Accordingly, we reject the defendant's claim that the statute is unconstitutionally vague on the ground that "it fails to provide people of ordinary intelligence a reasonable opportunity to understand the conduct it prohibits."  Hynes, 159 N.H. at 200.

The defendant next contends that "[a]llowing the police, the prosecutor or the jury to determine whether [the defendant's] activity constitutes 'volunteer service' would only authorize or encourage discriminatory enforcement of the statute."  We find instructive the approach set forth by the Second Circuit Court of Appeals in Farrell.  Applying that approach here, the defendant's claim that RSA 632-A:10, I, "authorizes or even encourages arbitrary and discriminatory enforcement," id. at 200, will fail if we conclude either:

> (1) that [the] statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.

Farrell, 449 F.3d at 494.

13

We need not address the first prong because we conclude that the defendant's conduct "falls within the core of the statute's prohibition." Id. The defendant engaged in Bible devotions with the victim, helped him with his homework, helped him build models, and took him on excursions away from his home unaccompanied by his parents — all activities that we have concluded above plainly "involv[ed] the care, instruction or guidance of [a] minor child[]." RSA 632-A:10, I. These activities also plainly implicated the policy concerns underlying the enactment of RSA 632-A:10, I. As the trial court noted, in companion informations to the charges here at issue, "the defendant was accused of sexually assaulting [the victim] . . . while he was volunteering to provide care, instruction or guidance." The defendant pleaded guilty to those charges. We conclude that the defendant's conduct "falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." Farrell, 449 F.3d at 494. Accordingly, we reject the defendant's argument that RSA 632-A:10, I, is unconstitutionally vague on the ground that "it authorizes or even encourages arbitrary and discriminatory enforcement." Hynes, 159 N.H. at 200.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. See Hynes, 159 N.H. at 200; Lamarche, 157 N.H. at 340-41; Farrell, 449 F.3d at 490, 494. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## III. Double Jeopardy

Finally, the defendant argues that the trial court "erred by entering multiple convictions or imposing multiple punishments" in violation of the double jeopardy provisions of the State and Federal Constitutions. See N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV. "The issue of double jeopardy presents a question of constitutional law, which we review de novo." State v. Carr, 167 N.H. 264, 273 (2015).

The trial court rejected the defendant's double jeopardy claim both on procedural grounds and on the merits. The court first ruled that "[b]y failing to raise this argument at the appropriate stage of litigation and delaying the issue until well after the verdicts, the defendant has effectively waived his double jeopardy rights." It then determined, on the merits, that "[t]he defendant undertook volunteer services with respect to the victim on separate dates and in separate locations, each of which constitutes a separate offense under the plain language of the statute." The defendant challenges both rulings.

For ease of analysis, we begin by considering the double jeopardy claim on the merits. This court and the United States Supreme Court have said that

14

the double jeopardy clauses of our respective constitutions provide three double jeopardy protections: (1) protection against subsequent prosecution for the same offense after acquittal; (2) protection against subsequent prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. See id.; Ohio v. Johnson, 467 U.S. 493, 497-98 (1984); N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV. The defendant raises a multiple punishments claim, arguing that his "activities with [the victim] . . . constituted, at most, one offense."

> Multiple punishment cases come in two varieties. First, there are the so-called "double-description" cases, in which the issue is whether two statutes describe two separate offenses or are merely different descriptions of the same offense. Second, there are "unit of prosecution" cases in which the problem is not that the same course of conduct is proscribed by more than one statute but that a defendant's continuing course of conduct is fragmented into more than one violation of a single statutory provision.

State v. Ramsey, 166 N.H. 45, 51 (2014) (quotations, citations, brackets, and ellipsis omitted). This case is of the second variety, involving the proper "unit of prosecution."

Ordinarily, we would first address the defendant's claim under the State Constitution. Ball, 124 N.H. at 231. Here, however, the defendant does not address the test we have generally applied to double jeopardy claims under our State Constitution. See Ramsey, 166 N.H. at 51 (noting that "[i]n both 'double description' and 'unit of prosecution' cases, we examine whether proof of the elements of the crime as charged will require a difference in evidence"); see also State v. Locke, 166 N.H. 344, 351, 353 (2014) (noting that our cases have not consistently applied our "same evidence" test and "invit[ing] parties in future cases to ask us to reconsider our double jeopardy jurisprudence"); cf. State v. Balch, 167 N.H. 329, 331-32 (2015) ("unit of prosecution" issue presented solely as a statutory construction claim); State v. Ayotte, 146 N.H. 544, 549 (2001) (same). Rather, both parties' arguments, and the trial court's analysis on this issue, focus upon the unit of prosecution intended by the legislature, "an inquiry that we have often utilized when addressing a federal double jeopardy challenge." State v. Lynch, 169 N.H. ___, ___ (decided March 10, 2017) (slip. op. at 16). Accordingly, we confine our review to analysis of the unit of prosecution intended by the legislature, cf. id. at ___ (slip op. at 16-17), and consider the defendant's double jeopardy challenge to be solely a federal constitutional claim. Cf. State v. Rodney Portigue, 125 N.H. 352, 361 (1984) (finding "no reviewable State constitutional claim presented" where "the defendant in his appeal relating to [a certain] issue wholly failed to raise anything but a federal constitutional claim and propositions in State case law relying entirely on federal law").

15

"[O]ur review of the defendant's double jeopardy claim under the United States Constitution requires us to consider the legislature's articulated intent." State v. Stratton, 132 N.H. 451, 455 (1989); see Ohio v. Johnson, 467 U.S. at 499 (noting that "[b]ecause the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent" (citations omitted)); Sanabria v. United States, 437 U.S. 54, 70 (1978) (noting that "[w]hether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on th[e] congressional choice" in defining the offense). Specifically, "we must determine the unit of prosecution intended by the legislature." Jennings, 155 N.H. at 777 (addressing federal constitutional challenge). "The issue is therefore one of statutory construction." United States v. Yazzie, 743 F.3d 1278, 1294 (9th Cir. 2014).

The defendant argues that "[u]nder the plain language of [RSA 632-A:10, I], 'undertak[ing]' is the unit of prosecution," and that his "agreement to help [the victim] with Bible devotions and school work and to counsel [the victim] and teach him 'manhood type principles' was a single 'undertaking.'" He contends that "even if an individual provides multiple acts of care, instruction or guidance, and even if those acts take place over a period of time and in different towns, as long as they take place pursuant to a single 'undertak[ing]' of 'employment or volunteer service,' they constitute a single offense."

The State, on the other hand, argues that "[t]he appropriate unit of prosecution should be each separate instance in which the defendant engaged in the care, instruction, or guidance of the victim." Although the State also considers "undertakes" to be "[t]he operative word" in RSA 632-A:10, I," it argues that "[t]he legislature's use of the word 'undertakes' . . . should be viewed in the context of surrounding statutory text." Specifically, the State asserts that "[t]he direct object of 'undertakes' is 'volunteer service,' which is further described by the object complements 'care, instruction or guidance.' Use of the disjunctive conjunction 'or' signals that the legislature is prohibiting participation in three distinct fields of volunteer service." The State concludes that "[t]he appropriate unit of prosecution should be each separate instance in which the defendant engaged in the care, instruction, or guidance of the victim."

The State's argument suggests that the term "undertakes" essentially means "performs" or "provides," so that the unit of prosecution is each performance or provision of any "service involving the care, instruction or guidance of minor children," RSA 632-A:10, I. The plain meaning of "undertakes," however, contravenes the State's assertion. The dictionary definition of "undertake" includes such phrases as "to take in hand," "enter upon," "set about," "to take upon oneself solemnly or expressly," and "put oneself under obligation to perform." Webster's Third New International

16

Dictionary 2491 (unabridged ed. 2002). Thus, we conclude that the term, as used in RSA 632-A:10, I, connotes an arrangement or placement of oneself in a position to provide or perform the prohibited services. Said another way, the act criminalized by the statute is not the provision of "service involving the care, instruction or guidance of minor children," RSA 632-A:10, I, but, rather, the making of an arrangement, or the placing of oneself in a position, to do so. This conclusion is reinforced by the statute's stated purpose of thwarting the attempts of "those who seek to exploit and abuse children . . . to create opportunities for themselves to do so." Laws 1988, 257:1 (emphasis added). Accordingly, we conclude that, as applicable to this case, the unit of prosecution intended by the legislature is each separate arrangement made for the provision or performance of "service involving the care, instruction or guidance of minor children." RSA 632-A:10, I.

Having so construed the statute, we agree with the defendant that his "agreement to help [the victim] with Bible devotions and school work and to counsel [the victim] and teach him 'manhood type principles' was a single 'undertaking.'" The victim's father testified that following the difficult 2013 holiday season, he and the victim's mother "were searching for some way to help [the victim] out" including "getting some kind of biblical counsel." The father testified that when he and his wife "attended the Bible studies with [the defendant], we had thought that he was a good resource as far as getting some good biblical counsel for our boy." The defendant, according to the father's testimony, "had mentioned that he had counseled boys in the past from church activities," and in particular, had "spoke[n] of previous encounters where he counseled troubled youngsters." The victim's father testified that he called the defendant on January 6, "and asked him if he would help [the victim] out" by doing Bible devotions with him, possibly helping him with his schooling, and "help[ing] [him] out with counseling." Thus, the evidence showed that the defendant portrayed himself as a teacher of Bible studies with experience in counseling children, and that he made an arrangement with the victim's parents to provide those services to their child. We conclude, therefore, that an "undertak[ing]" within the meaning of RSA 632-A:10, I, resulted from the father's telephone call with the defendant on January 6.

We also conclude that this was a single "undertak[ing]," RSA 632-A:10, I, that encompassed all of the defendant's volunteer service related to the victim from January 6 through January 10. We agree with the defendant that the father's contact with him on January 9 did "not [constitute] a separate undertaking." The father testified that in a telephone call to the defendant on January 9, he "voiced [his] concern" that the victim was withdrawing from the family and conveyed to the defendant that he and the victim's mother "wanted to make sure that [the victim] was being put back and pushed towards his parents as the authority figures in his life." According to the father's testimony, the defendant "agreed wholeheartedly that he was doing everything he could do [to] put [the victim] back, put him towards his parents as the authority figures

17

in his life." (Emphasis added.) We conclude that this communication can best be seen as ongoing feedback regarding an established arrangement and did not constitute a new arrangement or "undertak[ing]" pursuant to RSA 632-A:10, I. Although the victim's father indicated that he wanted a certain aspect of the agreed-upon services emphasized or prioritized over others, the nature and scope of the arrangement did not change so as to create a new, separate "undertak[ing]." RSA 632-A:10, I. Because the evidence at trial established only one "undertak[ing]," the defendant's four separate convictions, and the sentences therefor, constitute multiple punishments for the same offense in violation of the double jeopardy provision of the Federal Constitution. See Ohio v. Johnson, 467 U.S. at 499; Sanabria, 437 U.S. at 70-71.

We now turn to the dismissal of the defendant's double jeopardy claim on procedural grounds. On November 20, 2014, the defendant filed a "double jeopardy [objection] to multiple convictions." (Bolding, underlining and capitalization omitted.) The trial court treated this objection — and we refer to it likewise — as a "motion to dismiss three of his four convictions." The trial court ruled that the defendant "effectively waived his double jeopardy rights" by failing to raise them "at the appropriate stage of litigation." On appeal, the defendant asserts that his double jeopardy challenge was timely brought.

In addressing the defendant's double jeopardy claim on the merits, we noted that it falls under the category of so-called "'unit of prosecution' cases[,] in which the problem is not that the same course of conduct is proscribed by more than one statute but that a defendant's continuing course of conduct is fragmented into more than one violation of a single statutory provision." Ramsey, 166 N.H. at 51 (quotation and brackets omitted). To address the timeliness of the defendant's double jeopardy motion, it is now useful to also note that "[w]hether a particular course of conduct constitutes one or more violations of a single statutory offense affects an accused in three distinct, albeit related, ways: multiplicity in the indictment or information, multiple convictions for the same offense, and multiple sentences for the same offense." Brown v. State, 535 A.2d 485, 487-88 (Md. 1988).

"Multiplicity occurs when a single crime is separated into two or more indictments." United States v. Carrasco, 968 F. Supp. 948, 949 (S.D.N.Y. 1997). Here, the State brought four indictments against the defendant charging him with separate violations of RSA 632-A:10, I, on or about: (1) January 7, 2014, in Hopkinton; (2) January 7, 2014, in Concord; (3) January 10, 2014, in Hopkinton; and (4) January 10, 2014, in Concord. We concluded above that all of the defendant's volunteer service related to the victim and occurring from January 6 through January 10 constituted only one "undertak[ing]" in violation of RSA 632-A:10, I. Accordingly, the indictments against the defendant were multiplicitous.

18

The trial court did not explicitly cite the authority upon which it based its untimeliness ruling.  Nevertheless, the court's narrative and analysis indicate that the order was premised upon former Superior Court Criminal Rule 98(G), governing pretrial motions.  See Super. Ct. Crim. R. 98(G) (deleted by Sup. Ct. Order of January 20, 2016).  Specifically, the court's order states that the defendant's counsel "failed to disclose the anticipated motion at the pretrial conference."  In addition, the only "unit of prosecution" multiplicity case cited in support of the court's untimeliness ruling, United States v. Herzog, 644 F.2d 713 (8th Cir. 1981), was decided, in part, based upon the federal rule of criminal procedure requiring certain issues to be raised by pretrial motion.  Herzog, 644 F.2d. at 716.  Accordingly, we interpret the trial court's untimeliness ruling to be an enforcement of Rule 98(G), see In the Matter of Sheys & Blackburn, 168 N.H. at 39 (noting that "interpretation of a court order is a question of law, which we review de novo"), and we now determine whether it is sustainable on that basis.  "We review the trial court's decision to deny a motion . . . as untimely [under Rule 98(G)] for an unsustainable exercise of discretion."  State v. Knight, 161 N.H. 338, 341 (2011) (reviewing denial of motion to suppress under former Superior Court Rule 98(F)).

Superior Court Criminal Rule 98(G) provided:

The parties shall file all pretrial motions other than discovery related motions, including but not limited to motions to dismiss, motions to suppress and motions to sever charges or defendants, not more than sixty (60) calendar days after entry of a plea of not guilty or within such other time in advance of trial as the Court may order for good cause shown or may provide for in a pretrial scheduling order.

Super. Ct. Crim. R. 98(G).  We have treated a motion challenging an alleged defect in an indictment as being subject to a comparable prior rule.  See State v. Ortiz, 162 N.H. 585, 590 (2011) (applying former Superior Court Rule 98(F)); compare Super. Ct. R. 98(F) (retitled 2013) (amended 2014) (deleted 2016) (requiring all pretrial motions other than discovery-related motions to be brought within time specified in rule), with Super. Ct. Crim. R. 98(G).  In Ortiz, we held that the defendant's mid-trial challenge, brought "after the State rested its case, was untimely under [Superior Court Rule 98(F)]."  Ortiz, 162 N.H. at 590.  We cited cases from other jurisdictions — the majority of them federal — for guidance, and specifically cited Federal Rule of Criminal Procedure 12(b)(3)(B).  Id.  We ultimately concluded that the defendant's "failure to raise [his] claim in a timely fashion d[id] not preclude all appellate review, but rather confine[d] our review to plain error."  Id.  We similarly now look to other jurisdictions for guidance in determining whether the defendant's motion in this case was fatally untimely under Superior Court Criminal Rule 98(G).  Specifically, we find cases applying the federal rule applicable to pretrial

19

motions — Federal Rule of Criminal Procedure 12(b)(3) and its predecessors — instructive to our analysis of Superior Court Criminal Rule 98(G).

Rule 12(b)(3) provides that certain specified "defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Explicitly included in the specified list is "a defect in the indictment or information, including . . . charging the same offense in more than one count (multiplicity)." Fed. R. Crim. P. 12(b)(3)(B).

Before the explicit reference to multiplicity was added to Rule 12(b)(3)(B) in the 2014 amendments to Rule 12, see Fed. R. Crim. P. 12(b)(3) advisory committee note (2014), federal courts grappled with whether failure to raise a multiplicity challenge in a pretrial motion waived that claim with respect to either the convictions, the sentences, or both. See, e.g., United States v. Griffin, 765 F.2d 677, 680-82 (7th Cir. 1985) (affirming denial of petition to vacate or set aside sentence in part because defendant failed to raise multiplicity claim pretrial); United States v. Mastrangelo, 733 F.2d 793, 800 (11th Cir. 1984) (holding that defendant could "challenge his sentences, although his failure to object to the indictment prior to trial preclude[d] him from objecting to the multiple convictions"). In general, their approaches can be divided into two categories. See, e.g., United States v. Harris, 959 F.2d 246, 250 (D.C. Cir. 1992) (collecting cases), abrogated on other grounds by United States v. Stewart, 246 F.3d 728 (D.C. Cir. 2001); Griffin, 765 F.2d at 680-81 (collecting cases).

The first line of cases, exemplified by United States v. Rosenbarger, 536 F.2d 715 (6th Cir. 1976), treats a challenge to multplicitous sentences as a different issue than a challenge to multiplicitous indictments or convictions. Rosenbarger, 536 F.2d at 721-22. In Rosenbarger, the United States Court of Appeals for the Sixth Circuit started with the premise that under Rule 12, "if the defense of multiplicity is not raised prior to trial, it is waived." Id. at 721. Nevertheless, it concluded:

> The argument that one waives his right to object to the imposition of multiple sentences by his failure to object to the multiplicitous nature of an indictment is a non sequitur. Rule 12 applies only to objections with regard to the error in the indictment itself; the effect of Rule 12 is that dismissal of a multiplicitous indictment is not required; however, if sentences are imposed on each count of that multiplicitous indictment the defendant is not forced to serve the erroneous sentence because of any waiver.

Id. at 721-22. The court noted that "Rule 35 provides that in such a case the defendant may move that his sentence be corrected." Id. at 722 (referencing former Federal Rule of Criminal Procedure 35); see Fed. R. Crim. P. 35, 18

20

U.S.C. Appendix–Rules of Criminal Procedure at 1461 (1976) (amended 1979, 1983, 1984, 1985, 1986, 1991, 1998, 2002, 2004, 2007, 2009).  The court chose, however, to correct the sentence in the case then before it, reasoning:

> [S]ince the defect in the sentence is apparent from the record, it is proper for this Court to resolve the issue on direct appeal rather than to wait for defendant to file a Rule 35 motion as it is more appropriate, whenever possible, to correct errors reachable by the appeal rather than remit the parties to a new collateral proceeding.

Rosenbarger, 536 F.2d at 722 (quotation and brackets omitted).  The Fifth and Eleventh Circuits adopted the Rosenbarger approach.  See United States v. Bradsby, 628 F.2d 901, 906 (5th Cir. 1980); Mastrangelo, 733 F.2d at 800.

In the second line of cases, courts appear to recognize, at least implicitly, that because the indictment, conviction, and sentence for an offense are derivatively related, so too are any multiplicity problems associated with them; in other words, multiplicitous sentences necessarily result from multiplicitous convictions, which, in turn, result from multiplicitous indictments.  Cf. Brown v. State, 535 A.2d at 487 (noting relationship between indictments, convictions and sentences in multiplicity cases).  In Harris, the District of Columbia Circuit rejected the argument "that a multiplicity objection is not included within the defects contemplated by Rule 12(b)(2), because it is a defect in the sentencing, not in the indictment."  Harris, 959 F.2d at 250 (citing former Federal Rule of Criminal Procedure 12(b)(2)); compare Fed. R. Crim. P. 12(b)(2), 18 U.S.C. Appendix–Rules of Criminal Procedure at 752 (1988) (amended 1993, 2002, 2014) (requiring "[d]efenses and objections based on defects in the indictment" to be raised pretrial), with Fed. R. Crim. P. 12(b)(3).  "The purpose of the rule," the Harris court noted, "is to compel defendants to object to technical defects in the indictment early enough to allow the [trial] court to focus on their pretrial objections and, of course, to permit the prosecution to accommodate meritorious challenges, and to do so without disrupting an ongoing trial."  Harris, 959 F.2d at 250.  Accordingly, the court held that "[a] claim of multiplicity, at least in the typical case where the defect appears on the face of the indictment, falls clearly within the letter and spirit of the rule."  Id. at 250-51 (emphasis added).  In so doing, the court followed "[t]he majority of courts of appeals [in] hold[ing] that if the multiplicity objection could have been raised based on the indictment, Rule 12(b)(2) applies."  Id. at 250 (citing former Federal Rule of Criminal Procedure 12(b)(2) and cases from 1st, 2d, 4th, 7th and 8th Circuits).

Even after the 2014 amendments to Rule 12, the reasoning embodied in Harris has been read into Rule 12(b)(3).  See United States v. Anderson, 783 F.3d 727, 740 (8th Cir. 2015).  In Anderson, for example, after noting that Rule 12(b)(3) generally requires motions alleging a defect in the indictment to be raised before trial, the court stated that "[a] double-jeopardy objection is such

21

an alleged defect <u>if it appears on the face of the indictment</u>." <u>Id</u>. (quotation omitted) (emphasis added). The court's citations make clear that it considered that caveat to be implicitly contained in Rule 12(b)(3)'s language describing the motion's basis as being "then reasonably available" and the motion as one that "can be determined without a trial on the merits." <u>Fed. R. Crim. P.</u> 12(b)(3); <u>Anderson</u>, 783 F.3d at 740; <u>see</u> <u>Fed. R. Crim. P.</u> 12(b)(3), 18 U.S.C. Appendix–Rules of Criminal Procedure at 1104, advisory committee note (Supp. 2014) (stating that the "'then reasonably available' language is intended to ensure that a claim a party could not have raised on time is not subject to the limitation on review imposed by [Rule 12]").

Under the facts of this case, the defendant could potentially prevail under the reasoning of either <u>Rosenbarger</u> or <u>Harris</u>. We decline, however, to apply the <u>Rosenbarger</u> approach in this case. Although New Hampshire has a procedural rule somewhat analogous to former Federal Rule of Criminal Procedure 35, <u>see</u> <u>N.H. R. Crim. P.</u> 29(i) (providing court has discretion to correct an illegal sentence), we have not yet interpreted it. Furthermore, our case law dealing with challenges to illegal sentences is relatively sparse. <u>See, e.g.</u>, <u>State v. Kinne</u>, 161 N.H. 41, 46 (2010) (noting that a petitioner can collaterally challenge an illegal sentence); <u>State v. Sideris</u>, 157 N.H. 258, 264 (2008) (noting, in a case challenging the trial court's statutory authority to impose a sentence, that "[i]mposition of an illegal sentence is a serious error routinely corrected on plain error review"). We have never directly addressed whether a defendant in the circumstances of the defendant in this case could challenge, under our illegal sentence jurisprudence, sentences that plainly violate double jeopardy. Finally, the parties to this case have neither presented nor briefed that issue. Accordingly, we leave it for another day.

By contrast, the trial court's ruling, and the defendant's challenge to it, readily lend themselves to analysis under the <u>Harris</u> approach. In particular, the defendant argues that his double jeopardy "challenge only became ripe when he faced the prospect of multiple convictions." Thus, his argument at least touches upon the valid observation that "multiplicity problems may appear in various forms and may not be apparent until after the government presents evidence at trial." <u>Griffin</u>, 765 F.2d at 681. We see little logic — but potentially great injustice — in requiring a defendant to challenge, on penalty of waiving his claim, a defect in the indictment of which he could not reasonably be expected to be aware. Accordingly, we find the approach taken in the <u>Harris</u> line of cases — limiting the multiplicity defects that must be raised pretrial pursuant to Federal Rule of Criminal Procedure 12(b)(3) to those that are apparent on the face of the indictment — eminently reasonable.

Although Superior Court Criminal Rule 98(G) does not contain limiting language similar to the federal rule's requirements that the motion's basis be "then reasonably available" and that "the motion can be determined without a trial on the merits," <u>Fed. R. Crim. P.</u> 12(b)(3), we conclude that similar

22

purposes underlying the rules allow us to interpret Superior Court Criminal Rule 98(G) in light of the Harris approach to Federal Rule of Criminal Procedure 12(b)(3).  Our previous rules of criminal procedure lacked an explicit statement of purpose to help guide our interpretation; nevertheless, they were undoubtedly intended to serve purposes similar to those underlying criminal rules in other jurisdictions, such as, "to provide for orderly pretrial procedure, mandating fair notice and an opportunity to respond."  State v. Baliban, No. 1 CA–CR 08–0263, 2009 WL 1477933 at *2 (Ariz. Ct. App. May 26, 2009) (interpreting Rule 1.2 of the Arizona Rules of Criminal Procedure); cf. N.H. R. Crim. P. 1(b) (providing that the New Hampshire Rules of Criminal Procedure "shall be construed to provide for the just determination of every criminal proceeding" and "to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay").  Rules of criminal procedure also "advance judicial administration by preventing a party from, among other things, seeking to gain a tactical advantage through surprise." Baliban, 2009 WL 1477933 at *2; see State v. Breedlove, 999 N.E.2d 267, 274 (Ohio Ct. App. 2013) (noting that "[t]he general purpose of the criminal rules is to eliminate any elements of gamesmanship from a criminal proceeding"); cf. State v. Cromlish, 146 N.H. 277, 280 (2001) ("We have long recognized that justice is best served by a system that reduces surprise at trial by giving both parties the maximum amount of information.").  These goals closely correspond to reasons given for the approach taken in the Harris line of cases — an approach described as "promot[ing] fairness and efficiency by allowing courts to assess double jeopardy defects in indictments while evidence is still fresh, and by preventing defendants from making a tactical decision to delay raising such a challenge."  United States v. Wilson, 962 F.2d 621, 626 (7th Cir. 1992) (citation omitted).  Accordingly, we now hold that Rule 98(G) did not require a multiplicity issue to be raised by pretrial motion within the prescribed time limits unless the multiplicity defect appeared on the face of the indictments.  We note that this holding does not conflict with our determination in Ortiz that the defendant's challenge to an alleged defect in the indictment was untimely under former Superior Court Rule 98(F), because the alleged defect — that the indictment failed to "include the statutory definition of the word 'pattern'" — would have been apparent on the indictment's face.  Ortiz, 162 N.H. at 589.

The defendant here was charged in four separate indictments.  The first charged, in relevant part, that "[o]n or about the 7th of January, 2014 at Hopkinton, New Hampshire," the defendant "commit[ted] the crime of prohibition from child care services contrary to RSA 632-A:10," in that:

1. [The defendant] did engage in volunteer service involving the care, instruction or guidance of a minor child, [specifying the victim's initials and date of birth];

2. [The defendant] is prohibited from said acts, having been previously convicted of an offense involving sexual assault;

23

3. [The defendant] committed said acts knowingly.

(Italics, bolding, and capitalization omitted.)  The other three indictments were identical except for the date and location of the offense.

It is theoretically possible that a set of facts could exist such that separate undertakings in violation of RSA 632-A:10, I, could be proved on each of the dates and in each of the locations alleged in the four indictments.  Thus, we conclude that the multiplicitous nature of the charges was not apparent on the face of the indictments, and, therefore, the defendant's motion was not untimely under Rule 98(G) as we have interpreted it herein.  Accordingly, untimeliness cannot serve as an alternative basis for the denial of the defendant's double jeopardy motion, which, we concluded above, was meritorious.

For the foregoing reasons, we affirm the trial court's denial of the defendant's motion to dismiss for insufficient evidence and on the alternative ground that RSA 632-A:10, I, is unconstitutionally vague, reverse its order on the defendant's double jeopardy motion, and remand to the trial court with instructions to vacate three of the defendant's convictions and resulting sentences.

Affirmed in part; reversed in part; and remanded.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.

24